799 P.2d 785

**STATE of Arizona, Appellee,**

v.

*Jesus Rodriguez* **JIMENEZ, Appellant.**

**No. CR–88–0005–AP.**

Supreme Court of Arizona,
En Banc.

Aug. 7, 1990.

Reconsideration Denied
Oct. 9, 1990.

Robert K. Corbin, Atty. Gen. by Jessica G. Funkhouser, Chief Counsel, Crim. Div., and R. Wayne Ford, Asst. Atty. Gen., Phoenix, for appellee.

Dean W. Trebesch, Maricopa County Public Defender by John W. Rood, III, Deputy Public Defender, Phoenix, for appellant.

## OPINION

CORCORAN, Justice.

Appellant Jesus Rodriguez Jimenez (defendant) appeals from his conviction of first degree murder after a jury trial. We have jurisdiction pursuant to article 6, § 5(3) of the Arizona Constitution and A.R.S. §§ 13–4031 and –4033. For the following reasons, we affirm defendant's conviction for first degree murder, but reduce the death sentence to life imprisonment without possibility of parole for 35 years.

### Factual and Procedural Background

At 9:00 p.m. on November 30, 1986, police found the body of a 5–year–old girl wrapped in plastic in the trunk of a disabled car parked in the backyard of a house next door to the victim's. Defendant, then 17 years, 2 months old, lived in the house next door to the victim's with his aunt and uncle and their children. The victim's mother had reported the girl missing earlier that afternoon. The autopsy revealed that the victim died from manual strangulation, and that she had numerous post-mortem knife wounds on her body.

Police considered defendant a prime suspect because he had been home alone all day, and the victim often visited him there. Additionally, the victim had received a phone call from defendant earlier that af-

ternoon, and was last seen by her family near his house. Defendant was taken into custody for questioning by detectives. Defendant's natural parents lived in Mexico, and could not be contacted. However, the police did not advise defendant's aunt and uncle, who returned home while police were investigating the scene of the crime, of their minor nephew's constitutional rights; neither did the police invite them to attend the interview. During questioning and after having been read his *Miranda*[1] rights, defendant admitted to police that he had killed the victim because he heard "voices" compelling him to do so.

The state filed a petition for delinquency in juvenile court, and moved to transfer defendant to superior court for trial as an adult. The juvenile court ordered mental examinations and determined that defendant was competent. The court subsequently determined that probable cause existed to believe that defendant had committed first degree murder, and that the public safety or interest would best be served by transferring defendant for adult prosecution. *See generally* rule 14, Arizona Rules of Procedure for the Juvenile Court.

After ordering additional mental examinations pursuant to rule 11, Arizona Rules of Criminal Procedure, the trial court found defendant competent to stand trial. Defendant was tried as an adult and convicted by a jury of first degree murder, a class 1 felony, and kidnapping, a class 2 felony and dangerous crime against children. After a presentence aggravation and mitigation hearing, the trial court sentenced him to death on the murder count, and to an aggravated *consecutive* sentence of 22 years on the kidnapping count, with credit for 418 days of presentence incarceration. This appeal automatically followed. *See* A.R.S. § 13–4033 and rule 31.2(b), Arizona Rules of Criminal Procedure.

### Issues

Defendant raises numerous issues in his opening brief. Because of our disposition reducing the death penalty to life imprisonment, however, we need not address those issues. Only the following issues are relevant in this appeal:

1. Did the trial court err in failing to suppress defendant's confession?
2. Did the trial court err in finding that the aggravating factors outweighed the mitigating factors and in imposing the death penalty in this case?

### Analysis

1. Admissibility of Defendant's Confession

a. *Background*

Defendant was taken into custody and transported to the police station for questioning. He was met by Detective Tony Morales, who accompanied him to a small interrogation room that contained a table and two chairs. Morales began questioning defendant, in defendant's native Spanish language, at about 11:45 p.m. He first requested background information for approximately 15 minutes. Morales testified that defendant "appeared to respond well to everything I questioned him about," and that defendant seemed comfortable talking with him. Defendant informed him that he had been in the United States for two years, that he was living with his aunt and uncle, that his mother was in Mexico and he had never known his father, and that he was in 10th grade in high school, where he was experiencing learning difficulties.

After obtaining this background information, Morales told defendant that the victim had been seen at his house the afternoon she disappeared, that the police had found fresh handprints on the car in which her body was discovered that would be compared with defendant's, and that defendant was considered a "strong suspect." Defendant admitted knowing the little girl, but denied killing her. A few minutes later, Morales again summarized the information police had gathered about the crime and informed defendant that, in light of the circumstantial evidence, he was considered a "prime suspect." Defendant again denied any involvement. Morales explained to defendant that the person who killed the

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

little girl, if found guilty at trial, would face the death penalty by electrocution or the gas chamber.

Approximately 30 minutes after the interrogation had begun, Morales asked defendant "if he had sexually molested the child ... and somehow accidentally killed her." Defendant, after a 20– to 30–second pause, responded, "No. That's not how it happened at all. I will tell you exactly how it happened." The detective then stopped defendant from saying anything further and advised him of his constitutional rights. Defendant did not confess to the crime before he was advised of his rights.

Defendant was then read, in Spanish, his *Miranda* rights, first from a standard rights card, and then from a "Juvenile Rights Form," which contained the same listing of constitutional rights along with explanations geared to a juvenile's understanding. The detective also explained to defendant the possibility that he could be transferred to adult court for prosecution because of his age and the seriousness of the crime. After giving him this information, the detective questioned defendant to verify his comprehension. Defendant indicated he understood his constitutional rights, did not want an attorney or his parents present, and wished to confess to the crime.

Defendant's initial unrecorded confession took approximately an hour, beginning at 12:15 a.m. At its conclusion, at 1:12 a.m., Morales turned on a tape recorder, again explained defendant's constitutional rights and obtained a second, recorded statement, which he testified was substantially the same as the first, unrecorded confession.

In his confession, defendant admitted that the victim had visited his house earlier that afternoon to get some candy. He had let her into the house, where he was alone for the weekend while his aunt and uncle were visiting relatives in Mexico. As the victim walked toward the back bedroom, defendant felt an overpowering urge to harm her because "voices" had been urging him for two days to hurt someone. He followed the child to the bedroom, put his hands around her throat, and began to strangle her until she went limp. As he was choking her, he heard a knock at the front door. Defendant placed the child, unconscious but still alive, under the bed to hide her, and went to answer the door. The victim's sister and brother had arrived to ask if she was there because her mother wanted her at home. Defendant told them he had not seen her, and closed the door without letting them into the house. He returned to the bedroom, where he said he could hear the child crying under the bed. He believed she had regained consciousness. He grabbed a table knife on the way to the bedroom, where he strangled her until she was dead, repeatedly stabbed her, and left the knife imbedded in the roof of the child's mouth. Defendant then found a plastic trash bag, wrapped the child's body in the bag and sealed it with masking tape, and placed the body in the trunk of a car in his uncle's backyard.

After defendant's confession, he was photographed, fingerprinted, and transported to the juvenile detention facility.

Before trial, defense counsel moved to suppress the confession on the grounds that it was coerced and involuntary, and that defendant had not made a knowing, voluntary, and intelligent waiver of his *Miranda* rights under the totality of the circumstances, including the fact that no parent or guardian was present when he was questioned. After a voluntariness hearing, the trial court found that defendant was properly read his *Miranda* rights, that he indicated he understood the nature of the offense and the nature of the punishment, that the interrogation time was not excessively long and the procedure used was not overbearing, and that the police exerted no physical or psychological coercion.

On appeal, defendant contends the trial court erred in admitting a confession that was involuntary under the totality of the circumstances.

### b. *Voluntariness*

■ We start with the presumption that confessions resulting from custodial interrogation are inherently involuntary; to rebut that presumption, the state must

show by a preponderance of the evidence that the confession was freely and voluntarily made. *State v. Fulminante*, 161 Ariz. 237, 243, 778 P.2d 602, 608 (1988), *cert. granted on other grounds, Arizona v. Fulminante*, —— U.S. ——, 110 S.Ct. 1522, 108 L.Ed.2d 762, *cert. denied, Fulminante v. Arizona*, —— U.S. ——, 110 S.Ct. 1528, 108 L.Ed.2d 768 (1990). In deciding the voluntariness issue, the trial court must consider the totality of the circumstances surrounding the confession. *State v. LaGrand*, 153 Ariz. 21, 26, 734 P.2d 563, 568, *cert. denied, LaGrand v. Arizona*, 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987). We will not disturb the trial court's determination of the admissibility of a confession unless we find clear and manifest error. *State v. Rivera*, 152 Ariz. 507, 513, 733 P.2d 1090, 1096 (1987).

■ The United States Supreme Court has held that a necessary predicate to finding that an adult confession was obtained in violation of due process is coercive police activity. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). We judge police conduct on an objective basis that incorporates an evaluation of what the police actually knew about a particular defendant, including factors that may have affected a defendant's cognition, such as apparent low intelligence level or poor linguistic ability. *State v. Carrillo*, 156 Ariz. 125, 135, 750 P.2d 883, 893 (1988).

■ When a juvenile confession occurs as a result of police questioning, the "greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *In re Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527 (1967). Thus, we evaluate whether police conduct was coercive in the context of a juvenile confession by carefully scrutinizing not only the external circumstances under which the juvenile was questioned but also the juvenile's reasonably apparent cognitive abilities. We also consider other inherently coercive factors in the totality: the arguably coercive atmosphere of the police interrogation room; the focus of the investigation on defendant as the prime suspect; and police transportation to the station. *See Carrillo*, 156 Ariz. at 135, 750 P.2d at 893.

■ In this case, defendant failed to establish that any externally coercive police activity induced his confession. The record is devoid of any threats, promises, or misrepresentations made by the detective in obtaining defendant's incriminating statements. Both the detective's testimony and the transcript of the tape-recorded confession indicate that the interrogating detective treated defendant patiently and courteously, in a manner suitable to the detective's knowledge of defendant's age and intellectual ability. Moreover, defendant was calm and cooperative during questioning and no physical or psychological compulsion was utilized to obtain defendant's statements. Defendant was not questioned over an exceedingly long period of time; the entire interrogation, including his tape-recorded statements after the initial confession, lasted slightly more than 2 hours. From these circumstances, we conclude that the trial court correctly found the confession was not the result of externally coercive police conduct.

### c. *Juvenile Confessions: Compliance with Rule 18*

■ To be voluntary, a confession must not only be free from coercion, but the defendant's waiver of his constitutional rights must be knowing and intelligent. *Carrillo*, 156 Ariz. at 135, 750 P.2d at 893. The state argues that defendant did not raise a *Miranda* violation on appeal as a basis to suppress his confession.[2] However, inherent in defendant's involuntariness argument is the contention that he did not understand the nature of the rights

---

**2.** Defendant does not argue, for example, that his confession was taken before he was read and waived his *Miranda* rights. Indeed, the record indicates that defendant did not make any incriminating statements prior to being read his *Miranda* rights, and that only his post-*Miranda* statements were introduced as evidence against him at trial.

he waived by confessing to the crime. We have previously recognized that a voluntary confession necessarily requires both a cognitive waiver and a lack of compulsion. *Carrillo*, 156 Ariz. at 135 n. 15, 750 P.2d at 893 n. 15 ("Defendant must have understood his rights, intended to waive them and the decision must not have been compelled by governmental impropriety"). Thus, we consider whether defendant's waiver of his constitutional rights was cognitive under the circumstances of this case.

■ The cognition necessary to obtain a juvenile confession is defined by the standard set forth in rule 18, Arizona Rules of Procedure for the Juvenile Court. *State v. Mattox*, 113 Ariz. 252, 550 P.2d 630 (1976). Rule 18 provides:

> No extra-judicial statement to a peace officer or court officer by the child shall be admitted into evidence in juvenile court over objection unless the person offering the statement demonstrates to the satisfaction of the court that: The statement was voluntary and before making the statement the child was informed and intelligently comprehended that he need not make a statement, that any statement made might be used in a court proceeding, and that he had a right to consult with counsel prior to making a statement and during the taking of the statement, and that, if he or his parents, guardian or custodian could not afford an attorney, the court would appoint one for him prior to any questioning.

Rule 18 was intended to extend the protections of *Miranda* to the juvenile court. *Juvenile Appeal J–88515*, 139 Ariz. 260, 262, 678 P.2d 445, 447 (1984). However, this rule also applies to determine admissibility of a statement made by a juvenile later charged as an adult after a transfer hearing. *State v. Hardy*, 107 Ariz. 583, 491 P.2d 17 (1971).

Prior to the adoption of rule 18, this court found *per se* inadmissible juvenile confessions that were obtained without warnings about the possibility of transfer to adult court, or that were obtained without the juvenile's parents being notified of the juvenile's constitutional rights and the parents' right to be present during questioning. *See State v. Maloney*, 102 Ariz. 495, 433 P.2d 625 (1967); *State v. Cano*, 103 Ariz. 37, 436 P.2d 586 (1968); *State v. Councilman*, 105 Ariz. 145, 460 P.2d 640 (1969). However, since the adoption of rule 18, this court has applied the "totality of the circumstances" test to determine whether a juvenile voluntarily and intelligently waived his right against self-incrimination. *See State v. Jackson*, 118 Ariz. 270, 576 P.2d 129 (1978); *State v. Toney*, 113 Ariz. 404, 555 P.2d 650 (1976); *State v. Rodriquez*, 113 Ariz. 409, 555 P.2d 655 (1976); *Hardy*, 107 Ariz. at 584, 491 P.2d at 18. Additionally, the United States Supreme Court has adopted a totality of the circumstances test to determine whether a juvenile's waiver of constitutional rights was obtained in violation of due process. *See Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). The Supreme Court has reasoned:

> The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Fare v. Michael C.*, 442 U.S. at 725, 99 S.Ct. at 2572. *See also Gallegos v. Colorado*, 370 U.S. 49, 55, 82 S.Ct. 1209, 1213, 8 L.Ed.2d 325 (1962) ("There is no guide to the decision of cases such as this except the totality of circumstances.... The youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or friend—all these combine to make us conclude that the formal confession on which this conviction may have rested ... was obtained in violation of due process").

This court has considered the following factors in evaluating the totality of the circumstances surrounding a juvenile's waiver of fifth amendment rights: the

presence of the child's parents or their consent to a waiver of rights, *Hardy*, 107 Ariz. at 584, 491 P.2d at 18; *Rodriquez*, 113 Ariz. at 412, 555 P.2d at 658; the juvenile's prior exposure to *Miranda* warnings because of previous arrests, *Toney*, 113 Ariz. at 407, 555 P.2d at 653; and the juvenile's physical and emotional health at the time of questioning, including lack of sleep or food, *Jackson*, 118 Ariz. at 273, 576 P.2d at 132. Additionally, the court of appeals has considered the effect of a defendant's mental illness on a defendant's ability to make a cognitive waiver of *Miranda* rights. *State v. Davis*, 154 Ariz. 370, 373, 742 P.2d 1356, 1359 (App.1987). *See also State v. Scholtz*, 164 Ariz. 187, 791 P.2d 1070 (App.1990) (listing the above and various other factors that a court may consider in making voluntariness findings based on the totality of circumstances surrounding a juvenile confession).

In this case, the record shows that defendant was 17 years and 2 months old at the time of questioning and that he had a 10th grade education, although he informed the detective that he was having learning difficulties. His intelligence was in the borderline normal range, and subsequent mental examinations indicated that although he suffered from mental illness at the time of the offense, his mental state did not prevent him from cognitively understanding those rights explained to him or from making an effective waiver. Defendant had no prior experience with the police or with *Miranda* rights; however, the testimony and confession transcript indicate that Det. Morales thoroughly explained defendant's constitutional rights several times, that defendant indicated that he understood those rights, and that, when defendant indicated confusion, the detective further explained them in an understandable and simplified fashion appropriate to defendant's age and intelligence level. In fact, after explaining each right and consequence to defendant, the detective asked defendant to explain in his own words what he had been told to insure that he understood. These circumstances indicate a voluntary and knowing waiver made with full cognition of the consequences.

The record does indicate two troubling factors in the totality of the circumstances. The first is the failure of the police to notify or attempt to have present a parent or guardian when questioning a 17–year–old suspect of apparently below average intelligence. Before defendant was transported to the police station, Det. Morales spoke with defendant's aunt and uncle, with whom defendant was living, and who had returned from their weekend trip to Mexico before the police took defendant into custody. Morales advised them that defendant had been taken into custody, that he would be at the police station for "many hours" because this was going to be "a lengthy, extensive investigation." Detective Morales knew that defendant's natural mother lived in Mexico and could not be reached and that his aunt and uncle were functioning as his *de facto* guardians in the United States. However, he neither advised them of defendant's constitutional rights, nor indicated that they could accompany him to the police station or be present during his questioning. Neither did the detective ask defendant prior to questioning whether he wanted his aunt and uncle present. The only statement the detective made about defendant's parents was after he read defendant his rights:

Q. You, your parents, you told me that they lived in Mexico, right?

A. Yes.

Q. Well, then it is not possible that you would like them to be here when we talk?

A. No.

Q. You do not want them here, or do you?

A. No.

Q. No what?

A. I do not want them here.

After the voluntariness hearing, the trial court also found this factor troubling, but ultimately ruled as follows:

... I came to the conclusion that this defendant knew what he was doing and voluntarily made the statements. I also came to the conclusion that he certainly didn't want his parents there.

Given the fact that he's 17 going on 18, I assume ... that if he'd wanted his aunt and uncle there he would have asked for that. He asked for a pastor. Secondly, they were at the scene when he was arrested and didn't come to the jail with him....

We agree with the trial court that, although troubling, the fact that the police *did not give defendant an opportunity to* have his aunt and uncle present at the time he was questioned does not render his waiver ineffective or his confession involuntary. We have previously established that the lack of a juvenile's parents' presence is only one of the factors considered in the totality of the circumstances, and does not, in itself, render a juvenile's statement to police inadmissible. *See Hardy,* 107 Ariz. at 584, 491 P.2d at 18; *Rodriquez,* 113 Ariz. at 412, 555 P.2d at 658; *Jackson,* 118 Ariz. at 272, 576 P.2d at 131. This factor is mitigated when the juvenile has not requested the presence of his parent or another responsible parental figure. *Toney,* 113 Ariz. at 407, 555 P.2d at 653. We thus do not find that the trial court committed clear and manifest error in admitting the confession under these circumstances.

■ The second troubling factor is one alluded to by the trial court in its ruling. During questioning, defendant requested that the detective contact a particular clergyman. The request arose as follows:

Q. Do you have any questions you would like to ask me about your rights, anything you may not have understood?

A. I understand, and I don't have any questions. All I want is for you to call someone from the church—from the church.

Q. From the church? You want to talk to somebody from the church?

A. Yes, from my church where I was (inaudible).

Q. Where is this at?

A. At the Center of Christian Love. My uncle knows, but I don't know the address.

Q. Is it here in Phoenix?

A. Yes, it's here in Phoenix. I would like Pastor [name omitted]—I want him to come see me.

Q. You wish to speak to a pastor?

A. Yes.

Q. Will afterward be fine?

A. Yes.

Q. Later in the day, not right now?

A. Yes.

At the voluntariness hearing, defense counsel argued that defendant, as a juvenile not familiar with American customs, may have equated his pastor with an attorney, believing that the pastor was an adult with some authority who could assist him in dealing with the police. This contention was factually supported by information the detective gained during the confession, that when defendant "heard voices" compelling him toward violence a few weeks previous to the murder, he sought help from his high school counselor, who advised him to seek the counsel of his pastor. Defense counsel thus argued that defendant's request for a pastor may have been an indication that he was not ready to waive his privilege against self-incrimination.

Although this argument is appealing on its face, it does not render the confession inadmissible as involuntary. The United States Supreme Court has rejected the notion that a juvenile's request for anyone but an attorney invokes the protections of *Miranda* as to further questioning. *Fare v. Michael C.,* 442 U.S. at 722, 99 S.Ct. at 2570. The Court reasoned:

The Court in *Miranda* recognized that "the attorney plays a vital role in the administration of criminal justice under our Constitution." 384 U.S. at 481, 86 S.Ct. at 1631. It is this pivotal role of legal counsel that justifies the *per se* rule established in *Miranda,* and that distinguishes the request for counsel from the request for a probation officer, a clergyman, or a close friend.

*Id.* Furthermore, the record indicates that the detective fully explained to defendant the function and availability of an attorney:

Q. Well, Jessie, we also talked about what was an attorney, right? Did you understand me?

A. Yes.

Q. I told you that ... when I gave you, when I read you the right, I told you that you had the right to have an attorney present, right, remember ... do you remember? ...

A. Yes, yes, yes I understand.

....

Q. Well, an attorney is also a person that can speak for you and explain to you the crime that we think that you have committed, also, do you understand me?

A. Yes.

Q. We also talked that if you could not pay an attorney, that you had the right to the State to pay for an attorney, to represent you, do you remember?

A. Yes.

Q. Did I also explain that to you?

A. Yes.

Additionally, we note that defendant's request to see the pastor was made *after* his first unrecorded confession to the detective, but before he repeated his statements on tape. Given this entire record, we cannot find that the trial court committed clear and manifest error by allowing admission of the confession despite this circumstance.

Given the totality of the circumstances in this case, we hold that the trial court correctly admitted defendant's confession as cognitively made with no coercion. The confession was voluntary.

## 2. Imposition of the Death Penalty

In its special verdict, made after the aggravation/mitigation hearing, the court found two aggravating factors: (1) defendant committed the offense in an especially heinous, cruel, and depraved manner, *see* A.R.S. § 13–703(F)(6); and (2) that defendant was tried as an adult and the victim was under the age of 15. *See* A.R.S. § 13–703(F)(9). The trial court also found two mitigating factors: (1) defendant's age was only 17 years, 2 months at the time of the offense, *see* A.R.S. § 13–703(G)(5); and (2) defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired

as to constitute a defense to prosecution. *See* A.R.S. § 13–703(G)(1). However, after weighing the factors, the court found the mitigating circumstances insufficient to call for leniency and imposed the death penalty.

■ This court has a duty to independently review the aggravating and mitigating factors found by the trial court to ensure that the death penalty has been properly imposed. *Fulminante*, 161 Ariz. at 255, 778 P.2d at 620. In this case, defendant argues that the record provided insufficient evidence to establish the crime as especially cruel, heinous, or depraved. He also argues that the court erred in not concluding that the mitigating factors outweighed the aggravating factors.

### a. *Aggravating Factors*
#### (1) *Especially Heinous, Cruel, or Depraved*

■ The terms "heinous, cruel or depraved" are considered in the disjunctive; a finding of any one of the three elements beyond a reasonable doubt is sufficient to establish the aggravating circumstances pursuant to A.R.S. § 13–703(F)(6). *Fulminante*, 161 Ariz. at 255, 778 P.2d at 620; *State v. Wallace*, 151 Ariz. 362, 728 P.2d 232 (1986), *cert. denied, Wallace v. Arizona*, 483 U.S. 1011, 107 S.Ct. 3243, 97 L.Ed.2d 748 (1987).

■ We have defined a cruel murder as one involving the victim's pain and suffering prior to death. *Fulminante*, 161 Ariz. at 255, 778 P.2d at 620; *State v. Castaneda*, 150 Ariz. 382, 393, 724 P.2d 1, 12 (1986). To support a finding of cruelty, the state must prove beyond a reasonable doubt that the victim was conscious and suffered pain or distress at the time of the offense. *State v. Villafuerte*, 142 Ariz. 323, 690 P.2d 42 (1984).

In this case, the trial court concluded that the crime was cruel based on the following factors:

[T]here was clear evidence that the defendant strangled the five-year-old girl; that while she was unconscious she was

under the bed and the brother and sister came to the doorway; there was a conscious effort at that time to get rid of the other children; and in fact the confession was that he heard the victim cry, then went back, strangled her again and then the horrible stab wounds and mutilation of her body by leaving the knife protruding from the mouth, certainly a crime that shocks the conscience and probably outrages the community as well.

The court cannot find that this crime was sexually motivated, but it is certainly a consideration that should be considered. The testimony was that the stab marks indicated a sexual pattern, and given the fact that there was testimony of semen found on the inside of the defendant's clothing, it cannot be discounted completely.

There is no doubt that the crime was cruel and that the victim certainly suffered. She was five years of age and, as has been pointed out, certainly helpless of any attack of anybody of the size and age of the defendant.

Thus, the trial court based its finding of cruelty on evidence that the child cried between two incidents of strangulation, on the evidence of multiple stab wounds, and on the basis of her tender age and helplessness.

 In view of the uncontradicted evidence that the wounds were inflicted *after* her death and therefore could not have contributed to the victim's suffering, we find improper the trial court's consideration of the victim's stab wounds in its determination of whether her death was especially cruel. Post-mortem injuries are not evidence of cruelty, although they may be considered evidence of heinousness or depravity. *State v. Jeffers*, 135 Ariz. 404, 429, 661 P.2d 1105, 1130 (1983); *see also State v. Ceja*, 126 Ariz. 35, 612 P.2d 491 (1980).

 Additionally, we have also held that a victim's young age and helplessness should not be considered as factors supporting a finding of cruelty. *Castaneda*, 150 Ariz. at 393–94, 724 P.2d at 12–13. Here, the court considered the child's young age as an aggravating factor under A.R.S. § 13–703(F)(9). That factor includes a consideration of whether the victim was under 15 years of age, and should not be weighed a second time to support a finding of cruelty. *See State v. Tittle*, 147 Ariz. 339, 345, 710 P.2d 449, 455 (1985). The trial court thus erred in considering the age and helplessness of the child as evidence that the crime was especially cruel.

 The only remaining evidence to support the trial court's determination that the crime was especially cruel was the fact that, in his confession, defendant said he heard the victim cry between the two incidents of strangulation. We find this evidence inconclusive to establish beyond a reasonable doubt that the victim suffered in such a way that the court could conclude the crime was committed in an especially cruel manner within the specific legal meaning of A.R.S. § 13–703(F)(6). The record shows that defendant's perception of the victim's consciousness during the offense varied each time he described the crime. Although defendant related at one point that the victim was crying while he was stabbing her, the pathologist conclusively found that the stab wounds occurred after her death. Additionally, the record clearly establishes that defendant was "hearing voices" throughout the commission of the crime. Furthermore, the state did not present any expert or other testimony that this "cry" was evidence of the victim's consciousness and not merely the involuntary reflex of an unconscious victim.

 Neither did the state present any evidence that, under the circumstances involved here, the victim experienced pain and suffering. She knew and liked defendant, and, having come to his house for candy, had no reason to feel fear or experience apprehension. Defendant attacked her quickly and by surprise and she rapidly lost consciousness. It is not inherently "cruel" to murder a victim quickly and by surprise. *See Wallace*, 151 Ariz. at 367, 728 P.2d at 237. These circumstances differ greatly from other murder cases in which we have found the strangulation of a

young child to be especially cruel. *See State v. Beaty,* 158 Ariz. 232, 762 P.2d 519 (1988), *cert. denied, Beaty v. Arizona,* —— U.S. ——, 109 S.Ct. 3200, 105 L.Ed.2d 708 (1989) (defendant clamped hand over victim's mouth to muffle her screams, causing her to vomit, reflecting the "terror and horror" experienced by the victim); *State v. Roscoe,* 145 Ariz. 212, 700 P.2d 1312 (1984) (facts showed infliction of both mental distress and great physical pain, including sexual assaults, on child prior to death).

Under these circumstances, and due to the unreliable nature of defendant's statement as the only evidence of the victim's consciousness, the state did not prove beyond a reasonable doubt that the victim suffered pain and was conscious at the time of the offense. We thus find that the trial court erred in concluding that the crime was committed in an "especially cruel" manner in the context of a first degree murder, although we acknowledge that defendant's acts would satisfy the ordinary meaning of "cruel" in any other context.

The fact that the state failed to provide sufficient evidence to support a finding of cruelty, however, "is not of itself determinative for if the crime was committed in an especially heinous, cruel, or depraved manner, either all or one, an aggravating circumstance is present." *Ceja,* 126 Ariz. at 39, 612 P.2d at 495. We therefore turn to the heinous and depraved elements to determine whether this aggravating factor exists in the absence of a finding that the crime was especially cruel.

The trial court found that the crime was committed in a heinous and depraved manner, for the following reasons:

As far as being depraved, I think the facts, again, speak for themselves. But also the careful manner in which the crime was attempted to be covered up indicates that the defendant knew what was going on this particular Sunday. The blood was cleaned up and the body was attempted to be hid. The Court can only figure out that perhaps it would have been removed from the trunk of the car at some point in time if in fact it had

not been discovered. The keys were thrown away.

As far as being heinous, the facts also speak for themselves. This is not, quote, the norm of first degree murders. There are two separate strangulations with a time in between the two strangulations and then, of course, the stabbings.

The "heinous or depraved" factors of A.R.S. § 13–703(F)(6) focus on a defendant's state of mind at the time of the offense. *Fulminante,* 161 Ariz. at 255, 778 P.2d at 620. "Heinous" means "hatefully or shockingly evil, grossly bad"; "depraved" means "marked by debasement, corruption, perversion or deterioration." *Jeffers,* 135 Ariz. at 429, 661 P.2d at 1130; *State v. Knapp,* 114 Ariz. 531, 562 P.2d 704 (1977). We consider 5 factors in determining whether conduct is heinous or depraved: (1) whether defendant relished the murder; (2) whether defendant needlessly mutilated the victim; (3) whether the crime was senseless; (4) whether the victim was helpless; and (5) whether defendant inflicted gratuitous violence beyond that necessary to kill. *State v. Clabourne,* 142 Ariz. 335, 690 P.2d 54 (1984).

This record supports the trial court's findings that this crime was both heinous and depraved. Defendant needlessly mutilated the victim's body with numerous post-mortem stab wounds, indicating the use of gratuitous violence. This was a senseless crime; defendant, for no apparent reason, murdered a helpless child who trusted him. We hold that the trial court properly found the existence of heinousness and depravity sufficient to uphold the aggravating factor set forth in A.R.S. § 13–703(F)(6), even in the absence of a finding that the offense was especially cruel.

#### (2) *Defendant Tried as an Adult and Victim Under 15*

The second aggravating factor found by the trial court is also supported by the record. Defendant was tried as an adult and the victim was under 15 years of age. A.R.S. § 13–703(F)(9).

We hold that the trial court properly found the existence of two aggravating factors on this record.

### b. Mitigating Factors

#### (1) Defendant's Age

■ The trial court found that defendant's age at the time he committed the offense was a mitigating factor. *See* A.R.S. § 13–703(G)(5). We agree.

We have previously recognized that the young age of a defendant convicted of first degree murder is "a substantial and relevant factor" to be given "great weight," although we have also acknowledged that age alone will not act to require life imprisonment in every case of first degree murder by a minor. *State v. Valencia,* 132 Ariz. 248, 250, 645 P.2d 239, 241 (1982). The United States Supreme Court also has found the minor's age to be "a relevant mitigating factor of great weight," *Eddings v. Oklahoma,* 455 U.S. 104, 117, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982), although imposition of the death penalty on defendants for crimes committed at age 16 or 17 does not violate the eighth amendment prohibition against cruel and unusual punishment. *Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). *Cf. Thompson v. Oklahoma,* 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (eighth amendment prohibits imposition of death penalty on defendant who committed first degree murder at age 15).

In this case, we do not find defendant's age of 17 years, 2 months, in itself, of such substantial weight to require leniency, when balanced against the two aggravating factors. This was a heinous and depraved murder committed against a young child by a defendant who was tried as an adult, and who was, chronologically, only 10 months short of being fully accountable as an adult. Here, however, another mitigating factor must be considered in conjunction with defendant's age to properly determine the appropriate penalty.

#### (2) Impaired Mental Capacity

■ The trial court found as a second mitigating factor that defendant's mental capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired at the time of the offense, although not so impaired as to constitute a defense to the prosecution of the crime. *See* A.R.S. § 13–703(G)(1). The trial court considered this factor together with defendant's age, and concluded as follows:

> The Court has struggled with the mitigating factors that are involved in this case. I'll first address the defendant's mental capacity under 703(G)(1).
>
> There were reports from Dr. Bencomo, Dr. Patino, Dr. Burgoyne, Dr. Kruchek, Dr. Beaver, Dr. Dean and Dr. Garcia–Bunuel. I have read those reports....
>
> The diagnosis ranges from schizotypal personality, which means, at least in layman's terms, that he has some problems—I think they were described as being depressed, being a loner and probably not being able to handle the fact that he was in a public school where language was a problem. They go from that description to the paranoid schizophrenic with borderline intelligence who hears command voices and had no mental capacity at all to commit this crime.
>
> Those issues were presented to the jury, and the jury found that they did not rise to the criminal defense of insanity. That's not the test, of course, under (G)(1). The test there is whether or not they should be considered or are significant enough to be considered a mitigating factor.
>
> I have to look at the defendant's mental ability at the same time that I look at his age....
>
> ....
>
> So does the mitigating factor of mental capacity of a 17 year old who's borderline—is the mental capacity sufficient enough because he was 17 to allow the life sentence? And that's as you all know, what I've been struggling with.
>
> However, after weighing the mitigating circumstances versus the aggravating circumstances, the Court does not find that they are sufficiently substantial to call for leniency. The aggravating

circumstances outweigh the mitigating circumstances. The five year old was completely helpless and it appears to be a completely premeditated, covered-up murder.

In determining whether the trial court properly imposed the death penalty after weighing the mitigating factors, we must thoroughly examine the evidence regarding defendant's impaired mental capacity and consider it together with his young age. This record contains extensive expert opinions about defendant's mental condition.

▇▇▇ Defendant was first examined by Armando A. Bencomo, Ph.D., on December 12, 1986, at the order of the juvenile court. The purpose of that examination was to determine whether defendant should be transferred to adult status for trial. Dr. Bencomo examined defendant for 4 hours at the Juvenile Detention Center. He concluded that defendant's I.Q. was 74, and that although he was not retarded, defendant was functioning in the "borderline range of intelligence." He also concluded that "[t]he juvenile suffers a serious mental illness."

Defendant was also examined on January 19, 1987, by Francis A. Enos, Ph.D., who performed a psychological evaluation at the order of the juvenile court to determine defendant's level of competency. Dr. Enos agreed with Dr. Bencomo's evaluation that defendant's I.Q. was at least 74, and noted that academically, he was functioning at the 6th grade level. Dr. Enos concluded that defendant was competent to stand trial and to make a competent waiver of his rights consequent to a guilty plea. However, regarding defendant's mental state at the time of the offense, Dr. Enos made the following conclusions:

> Although [defendant] has an awareness of what he did and an apparently good memory for the situation, he was apparently acting under a compulsion that he could not control. Therefore, there appears to be a direct relation between the subject's emotional pathology and the commission of the crime. The probable mental condition of the defendant at the time of the offense appears to have been

that he was acting under an uncontrollable compulsion and suffering from a mental disease of a schizophrenic nature—and there is a direct relationship between the disease and the alleged offense.

At a hearing in juvenile court on defendant's competency, Lauro Amezcua–Patino, M.D., testified that he had examined defendant as part of a 72-hour team evaluation ordered by the juvenile court in December 1986. Dr. Patino testified that he believed defendant was psychotic at the time of the offense, and that he had acted "out of a very poor judgment, out of complete irrational thoughts." Dr. Patino also testified that defendant was able to know the nature and quality of his acts, and at the time of the offense knew the difference between right and wrong, and, in his opinion, was not committable to a mental institution at the time of the hearing.

After defendant's transfer to superior court for trial as an adult, the court again ordered mental examinations to determine his competency, pursuant to rule 11. On July 17, 1987, Wayne A. Beaver, Ph.D., conducted a two-hour examination of defendant at the Madison Street Jail, with an interpreter present. He also concluded that defendant was competent to stand trial and to waive his rights pursuant to a plea agreement, but further noted:

> The probable mental condition of the defendant at the time of the offense was certainly confused and impaired. He has a history of command hallucinations and schizophrenic symptoms.... [T]he voices which command his behavior appear to be unrelenting and irresistible, ... [A]t the time of the offense, this individual was impaired by his mental condition but that prior to and afterward he was aware of its wrongfulness.
>
> The relationship of such disease or defect to the alleged offense is inseparable. The offense was committed because of the strength of the command auditory hallucinations and his inability to resist their unrelenting forcefulness....

Additionally, on June 16, 1987, defendant was also examined by Leonardo Garcia–Bu-

nuel, M.D., during a 90–minute interview at the Madison Street Jail. Dr. Garcia–Bunuel also concluded that defendant was competent to stand trial and, with appropriate "education," would be competent to make a decision to plead guilty. However, the doctor also concluded:

> However, it is my opinion that [defendant] suffers from a major mental disorder at this time, and in all probability, was suffering from such disorder at the time of the commission of the alleged crime. The relationship of his mental illness to the alleged crime of murder needs to be thoroughly assessed.

Defendant was next evaluated on July 16, 1987, by Thomas F. Kruchek, M.D., who concluded that defendant would be competent to stand trial and to enter a plea of guilty, if a Spanish-speaking interpreter assisted him in the proceedings. Dr. Kruchek further noted:

> It is felt that the defendant, at the time of the offense, was suffering from a schizophrenic disorder, paranoid, ... and from what I could learn, I found that at the time of the offense because of the compelling nature of the hallucination he was unable to control the wrongfulness of the urge or compulsion, if the wrongfulness did indeed take place. I feel that he was unable to respond to his sense of right or wrong because of the compelling nature of the urge. There was diminished capacity to properly assess the nature and quality and consequences of his conduct and to properly conduct himself in society. The defendant was not able to conform his conduct to the requirements of the law which he is alleged to have violated.

At trial, several of those experts testified about their opinions of defendant's mental state at the time of the offense. Dr. Kruchek, a board-certified psychiatrist, testified for the defense that he had diagnosed schizophrenia, a psychotic illness, noting that defendant "doesn't have the usual response as far as feeling is concerned. One of the elements of it is hallucinatory, loss of reality, occasionally delusioned." Dr. Kruchek further testified as follows:

Q. Doctor, are you able to say to a reasonable degree of medical certainty that on [the date of the offense defendant] was suffering from the schizophrenic, paranoid-type of problem?

A. Yes.

Q. Is that diagnosis considered a mental disease or defect?

A. Yes.

Q. And how does that mental disease or defect affect a person's abilities to determine right from wrong?

A. It can influence his ability to control actions in such a way that he does not necessarily respond to his awareness of right and wrong.

Q. It would impact upon his ability to discern whether something was right or something was wrong?

A. That's correct.

Q. Is that in terms of his actions or inactions?

A. Yes. He would be compelled to respond to this voice.

Q. Would he, at the time he was experiencing the voices, know the difference between right and wrong?

A. I don't think at the time he was hearing the voices he knew right from wrong.

Q. Don't you think that he knew he was choking and killing this little girl when he was doing it?

A. It all depends on how you define "knowing." I think he was unable to respond to that "knowing" in the sense that he would stop.

....

I don't think he knew that it was wrong in the sense that he could control that. I think he was responding to a voice telling him to kill.

Wayne A. Beaver, Ph.D., a psychologist, also testified that he had diagnosed defendant's condition as schizophrenia, paranoid-type, chronic, characterized by delusions and hallucinations, primarily through voices that appeared real to him and demanded that he do things he could not resist. Dr. Beaver opined that defendant was "acutely schizophrenic" at the time of the offense; that, although defendant prob-

ably knew the nature of what he was doing and knew that it was wrong, "I think that when one is suffering from command hallucinations, they may know what they are doing is not right but the hallucinations are so strong, persistent, unwavering, that they are essentially not able to resist them."

To rebut defendant's insanity defense, the state called Dr. Patino, who had testified at the juvenile hearing. Dr. Patino reconfirmed his diagnosis that defendant had a schizotypal personality disorder, but agreed that at the time of the offense, defendant was "completely delusional, psychotic." Dr. Patino concluded that defendant knew the nature of his acts and that what he was doing was wrong, but conceded it was possible he "could not control his conduct" at the time of the offense.

Prior to sentencing, the trial court again ordered defendant examined to determine his competency, pursuant to rule 11. On December 2, 1987, Robert T. Dean, Jr., M.D., examined defendant; he diagnosed borderline intelligence and schizophrenic disorder, paranoid-type; however, he concluded that defendant was competent to be sentenced. Additionally, Dr. Garcia–Bunuel, Medical Director of Correctional Health Services, again examined defendant and concluded that he was competent to be sentenced, but expressed the following opinion:

> I do not have any question about the issue of whether Jesus is suffering from a major mental illness now or at the time of the commission of the crime. Dr. Armando Bencomo, in his report to the Court of December 11, 1986, diagnosed him as Major Depressive Episode with Psychotic Features, Recurrent. Dr. Thomas F. Kruchek, on July 16, 1987, advised the court that the defendant was suffering from a "schizophrenic disorder, paranoid." These diagnoses are not incompatible in that a severe depression may lead to delusional, paranoid thinking and it may be misdiagnosed when the symptoms may, in fact, be the result of a severe thought disorder, namely paranoid schizophrenia. I myself, feel uncomfortable as to the degree of diagnostic certainty between the two diagnostic possibilities mentioned above.

> ....

> ... [I]n my professional opinion, [defendant] is now competent to be sentenced. Yet, in expressing this opinion, I am deeply concerned about how this defendant's mental condition at the time of the murder could have eventually caused a finding of "first degree murder." Had I been asked to give an opinion on this most crucial issue, I would have stated, unequivocally, that he did not have the ability to form any malicious intent in that he was, very likely, responding to "command" hallucinations which he could not fail to obey.

> I am not challenging the jury's findings and verdict, for they had access to information not available to me. There was a trial during which evidence was presented to the jury. But [defendant] is a seriously mentally ill individual; of this I am certain.

> Given this conclusion, I feel I have no alternative but to request your court to impose any penalty, short of a death sentence. Heinous and tragic as the crime was, a person afflicted by a serious mental disorder, as stated above, could not have planned, with premeditation aforethought, the killing of someone.

We believe defendant has shown by a preponderance of the evidence that his mental capacity was so impaired that he was unable to appreciate the wrongfulness of his conduct at the time of the offense and was unable to conform his conduct to the requirements of the law. *See* A.R.S. § 13–703(G)(1). Although this impairment was not great enough to constitute a defense to the crime, we find that defendant's mental incapacity was not only a substantial mitigating factor in this case, but a major contributing cause of his conduct that was "sufficiently substantial" to outweigh the aggravating factors present in this case. *See State v. Brookover*, 124 Ariz. 38, 601 P.2d 1322 (1979). Apparently, the heinousness and depravity of this crime were directly related to defendant's mental impairment, as was the unfortunate cir-

cumstance that the victim was a helpless child under the age of 15. Given the strong evidence in this case of the severity of defendant's mental illness, combined with the substantial and relevant factor of defendant's young age and borderline intelligence level affecting his intellectual maturity, we believe that leniency is required. We therefore reduce the sentence from death to life imprisonment. *See State v. Mauro*, 159 Ariz. 186, 208, 766 P.2d 59, 81 (1988); *Brookover*, 124 Ariz. at 42, 601 P.2d at 1326; *State v. Doss*, 116 Ariz. 156, 163, 568 P.2d 1054, 1061 (1977).

*Disposition*

■ We affirm defendant's conviction for first degree murder. However, we modify the sentence, reducing it from death to life imprisonment without possibility of parole until defendant has served at least 35 years, pursuant to the provisions of A.R.S. § 13-703(A), (E), and (F)(9), which apply because the victim was under 15 years of age. Defendant's life sentence is statutorily required to be served *consecutively* to his sentence for kidnapping.[3] *See* A.R.S. § 13-604.01(J).

We have examined the record for fundamental error, pursuant to A.R.S. § 13-4035. Having found none, we affirm the judgment, as modified.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and MOELLER, JJ., concur.

---

**3.** Because of our disposition, we consider *sua sponte* whether the imposition of consecutive sentences for these two crimes would constitute double punishment prohibited by A.R.S. § 13-116, under the 3-prong test set forth in *State v. Gordon*, 161 Ariz. 308, 778 P.2d 1204 (1989). We find that, because the crimes of kidnapping and murder involved separate acts or courses of conduct, consecutive sentences appropriately can be applied. *See Gordon.*