NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellant*,

*v.*

LUIS BALTIERREZ, *Appellee*.

No. 1 CA-CR 24-0077
FILED 12-19-2024

Appeal from the Superior Court in Maricopa County
No. CR2023-006490-001
The Honorable Kevin B. Wein, Judge

**VACATED**

COUNSEL

Maricopa County Attorney's Office, Phoenix
By Quinton S. Gregory
*Counsel for Appellant*

Maricopa County Public Defender's Office, Phoenix
By Jennifer Roach
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Judge Daniel J. Kiley delivered the decision of the Court, in which Presiding Judge Michael J. Brown and Judge D. Steven Williams joined.

---

**K I L E Y**, Judge:

¶1  The State appeals from the superior court's order suppressing statements made by 15-year-old Luis Baltierrez during custodial interrogation. For the following reasons, we vacate the suppression order.

## FACTS AND PROCEDURAL HISTORY

¶2  Baltierrez had been held at a juvenile detention facility for two weeks pending adjudication on an unrelated matter when Detectives De Santiago and Nunley arrived one day in February 2023 to interview him about a homicide they were investigating. When they arrived at the facility, the detectives informed the detention facility staff that they wanted to question Baltierrez about a homicide. Detention Officer Bujanda spoke with Baltierrez, telling him that "officers from the Phoenix Police Department [were there] to speak to [him]." Bujanda did not, however, tell Baltierrez "anything about the subject of the interview." Another detention officer then read him a form entitled "Detained Youth Rights Regarding Interviews with Law Enforcement Officers" that states in part,

> I have the right to say that I do not wish to talk to a Law Enforcement Officer.

> If I decide to talk to a Law Enforcement Officer, I have the right to stop the interview at any time.

¶3  The form was handed to Baltierrez, who checked the box indicating he agreed to speaking with the detectives and signed it.

¶4  Baltierrez was then led into the room where the detectives were waiting. The recording of the interview reflects that De Santiago told Baltierrez that he wanted to talk with him because his "name has come up" in an investigation, adding that he wanted to start by "get[ting]" Baltierrez's "basic information." After answering a few background questions, Baltierrez interjected, "Can I ask why I'm here first? I don't want to speak unless I know why I'm here." When De Santiago responded,

"Yeah, I'll explain that to you later. These are just – I'm just getting your basic information," Baltierrez reiterated, "I would like to know why I'm here." De Santiago promised to "explain[] why I need your help," but stated that he would first "read you your rights." De Santiago then began reading a written advisement used to inform juveniles of their *Miranda*[1] rights. *See* A.R.S. § 8-303(E) ("A peace officer who takes a juvenile into temporary custody . . . shall advise the juvenile before questioning of the juvenile's juvenile [M]iranda rights in language that is comprehensible to a juvenile . . ."); *see also State v. Jimenez*, 165 Ariz. 444, 448 (1990) (explaining that a juvenile *Miranda* rights form "contained the same listing of constitutional rights [as that of a standard rights card] along with explanations geared to a juvenile's understanding" and included additional considerations relevant to juvenile interviews such as advising that a juvenile may have a parent present or the possibility that the case may be transferred to adult court).

¶5        The juvenile *Miranda* rights form contained the following provisions:

> 1. You have the right to remain silent. This means that you do not have to talk to me or answer my questions about this crime. You can be silent if you wish. Do you understand this right?

> 2. Anything you say can and will be used against you in a court of law. This means that anything you tell me, I can use later against you in a court of law. A court of law is a place where a person or judge will decide whether you committed a crime. A judge is like an umpire in a baseball game. He decides whether you have acted in a right or wrong way. If you did something wrong, you may be punished. Do you understand this right?

> 3. You have the right to have an attorney present prior to and during questioning. This means, if you want one, you are allowed to have a lawyer here before and during my questions to you. An attorney is a lawyer or person who will speak for you and help you concerning the crime which we think you have done. Do you understand this right?

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

4. If you cannot afford an attorney, you have the right to have one appointed for you prior to questioning. This means if you do not have the money to get a lawyer, if you wish, one will be given to you free of charge before you are questioned. Do you understand this right?

If you want to answer questions without a lawyer present, you may. You will still have the right to stop answering my questions at any time. Do you understand each of these rights?

Do you agree to give up these rights and talk to me?

Do you want to have your parent(s) or guardian(s) present during questioning?

The possibility exists that your case may be handled by an adult court. If you are taken to adult court, you may get more punishment than you would receive in juvenile court. Do you understand this?

¶6        After reading each of the first five paragraphs, De Santiago asked whether Baltierrez understood what he had just read. Each time, Baltierrez answered in the affirmative. When De Santiago read the question, "Do you agree to give up these rights and talk to me at this time?", Baltierrez replied, "Yeah, but I just want to know why I'm here." De Santiago then continued reading from the advisement form. When he asked if Baltierrez wanted a parent or guardian present during questioning, Baltierrez answered, "No." When asked if he understood that the case may be handled in adult court, Baltierrez answered "Yeah."

¶7        De Santiago asked more questions about Baltierrez's background and about his relationship with "Eric" (a pseudonym). After initially denying knowing Eric, Baltierrez acknowledged having "met him" but denied knowing him well. Baltierrez likewise acknowledged being acquainted with Eric's girlfriend.

¶8        De Santiago then explained the purpose of the interview, stating, "There was an incident that occurred, you know, just right outside your apartment," explaining, "There was a shooting there that happened." When the detective asked if he was present at the shooting, Baltierrez denied it. When the detective asked again, Baltierrez replied, "I wasn't there. Are you not listening?"

**¶9** After further questions, Baltierrez made statements that appeared to implicate Eric in the shooting.[2] When shown a picture of a gun, Baltierrez replied, "It's not my gun." And after being asked if it belonged to Eric, Baltierrez refused to give a direct answer, simply repeating, "I already said it's not my gun."

**¶10** De Santiago then told Baltierrez that security video footage from nearby businesses showed him at the scene of the shooting. "All I want to know," the detective stated, is "why it happened." Baltierrez then acknowledged that he was present at the time but insisted, "I didn't shoot the dude, bro. Eric shot. I did not shoot." When asked for more information, Baltierrez answered, "That guy tried to attack Eric, and Eric shot his ass."

**¶11** Questioning continued until, fifteen minutes into the interview, Baltierrez said, "I don't want to talk no more." The detective nonetheless continued to ask more questions, which Baltierrez answered. When the detective told Baltierrez that security video footage shows that he, not Eric, fired the gun and asked why he did so, Baltierrez replied, "He tried to attack me, bro." Moments later, Baltierrez restated, "I don't want to talk no more." The interview concluded at that point. The recording of the entire interview lasts sixteen minutes.

**¶12** After Baltierrez was escorted out of the room by detention facility staff, the detectives disclosed that they had a warrant to take a DNA sample from Baltierrez. Baltierrez refused to provide a DNA sample, and the detectives did not press the issue.

**¶13** Baltierrez was charged with second-degree murder, a class 1 dangerous felony, unlawful discharge of a firearm, a class 6 felony, and possession of a firearm by a minor, a class 6 felony.

**¶14** The superior court conducted a voluntariness hearing concerning the statements Baltierrez made to detectives. Detention Officer Bujanda and Detective De Santiago both testified. After the hearing, the court issued a ruling in which it found, first, that Baltierrez "clearly expressed his desire to remain silent when he said, towards the end of the interview, that he did not want to answer any more questions." "Any statements made after" that point, the court found, were inadmissible.

---

[2] Specifically, Baltierrez stated that Eric was staying at his apartment around the time of the shooting and that when Eric told him that "he was on the run," he told Eric "to leave my house."

**¶15**       The court went on to find that Baltierrez's agreement to answer questions at the outset of the interview was "conditioned" upon knowing "what he was being questioned about." Because Detective De Santiago "refused" to answer Baltierrez's question about the subject of the interview, the court held, Baltierrez "lacked a full awareness" of "the nature of the right" he was waiving and the "consequences" of doing so. Baltierrez only "conditionally waived his right to remain silent," the court determined, and so his responses to questions asked "after the reading of his juvenile *Miranda* rights were involuntary and are inadmissible at trial."

**¶16**       The court also found that Baltierrez's statements were involuntary because he "was reportedly told by a juvenile probation officer that he was required to sign a form agreeing to speak with police." Finally, the court found that Baltierrez's "young age" and the absence of "a parent [or] an attorney" during the interview supported a finding of involuntariness.

**¶17**       After the court granted the State's motion to dismiss the case without prejudice, the State timely appealed from the suppression order. We have jurisdiction under Article 6, Section 9 of the Arizona Constitution and A.R.S. § 13-4032(6).

## DISCUSSION

**¶18**       The State does not challenge the suppression of the statements – such as, "He tried to attack me, bro" – that Baltierrez made after he stated, for the first time, "I don't want to talk no more." *See State v. Szpyrka*, 220 Ariz. 59, 61-62, ¶ 5 (App. 2008) (holding that defendant unambiguously invoked his right to remain silent when he said, "I got nothin' to say").

**¶19**       The State argues, however, that the superior court erred in suppressing Baltierrez's statements made after Baltierrez said, at the outset of the interview, "I don't want to speak unless I know why I'm here." Baltierrez's conditional statement was not, the State contends, an invocation of his right to remain silent. On the contrary, the State argues, Baltierrez validly waived his *Miranda* rights by proceeding to answer Detective De Santiago's questions. In response, Baltierrez argues that the trial court did not err in suppressing all of his statements as involuntary.

**¶20**       This Court reviews both a ruling on a motion to suppress evidence and a determination of the voluntariness of a defendant's confession for an abuse of discretion. *State v. Newell*, 212 Ariz. 389, ¶ 22 n.6 (2006). While we "review the court's ultimate legal conclusion[s] *de novo*,"

*State v. Aldana*, 252 Ariz. 69, 72, ¶ 10 (App. 2021), we view the evidence "in the light most favorable to sustaining the court's ruling." *State v. Brown*, 233 Ariz. 153, 156, ¶ 4 (App. 2013).

**¶21**      Confessions are presumptively involuntary. *See*, *e.g.*, *In re Timothy C.*, 194 Ariz. 159, 162, ¶ 13 (App. 1998). A confession is involuntary if the defendant's will was overborne by coercion, threats, or promises. *See*, *e.g.*, *State v. Boggs*, 218 Ariz. 325, 335-36, ¶ 44 (2008). When a defendant challenges the voluntariness of a confession, the State "bears the burden of proving by a preponderance of the evidence that [the] confession [was] voluntary and freely given." *State v. Strayhand*, 184 Ariz. 571, 579 (App. 1995).

**¶22**      When assessing the voluntariness of a confession made by a juvenile, a court must be mindful "that juveniles may be more susceptible to certain police tactics than adults and as such their will may be more easily overborne." *State v. Huerstel*, 206 Ariz. 93, 106, ¶ 57 (2003). Factors to consider in assessing the voluntariness of a juvenile's confession include the juvenile's "age, education, and intelligence," *In re Andre M.*, 207 Ariz. 482, 485, ¶ 11 (2004), including "the juvenile's reasonably apparent cognitive abilities," *State v. Jimenez*, 165 Ariz. 444, 449 (1990). Other relevant factors include the "length of detention and questioning," whether the juvenile was advised of his or her constitutional rights in an age-appropriate manner, and whether a parent was present during the questioning. *Andre M.*, 207 Ariz. at 485-86, ¶¶ 11, 18 (citations omitted). The court must also consider the juvenile's prior experience, if any, with the legal system, *State v. Canez*, 202 Ariz. 133, 153, ¶ 59 (2002), as well as the juvenile's "demeanor" during questioning, *State v. Doody*, 187 Ariz. 363, 369 (1996). Ultimately, however, the voluntariness of a confession by a juvenile, like that of an adult, turns on whether the confession was the product of coercive police conduct. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."); *see also In re Timothy C.*, 194 Ariz. 159, 160, 162-63, ¶¶ 2, 14-15 (App. 1998) (noting that 12-year-old could challenge voluntariness of confession only if confession resulted from coercive state action).

**¶23**      Here, the State presented testimony that the detectives employed no threats, coercion or promises to induce Baltierrez's statements. The court made no express findings on that point. Instead, the court found, *inter alia*, that Detective De Santiago "violated [Baltierrez's] constitutional rights" by "refus[ing] to inform [him] about the nature of the

investigation before proceeding" to question him. The court concluded that Baltierrez "lacked a full awareness" of the rights he was waiving and the consequences of doing so because De Santiago failed to respond when Baltierrez asked "why he was being questioned."

¶24 A suspect's waiver of his or her right to remain silent is not knowing and intelligent unless the suspect has "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). To establish a valid waiver, however, all the State need show is that the suspect understood his or her rights and chose to waive them. *See State v. Naranjo*, 234 Ariz. 233, 238, ¶ 7 (2014) ("A knowing and intelligent waiver of *Miranda* rights occurs when the suspect understands those rights and intends to waive them."). A suspect need not be aware of the nature of the crime(s) under investigation in order to knowingly, voluntarily and intelligently waive his or her rights and submit to questioning. *See Colorado v. Spring*, 479 U.S. 564, 577 (1987) (rejecting defendant's claim that he did not validly waive his *Miranda* rights because he was unaware that he would be questioned about a homicide; "[W]e hold that a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his [*Miranda* rights]."); *see also State v. Walden*, 183 Ariz. 595, 610 (1995), *overruled on other grounds by State v. Ives*, 187 Ariz. 102 (1996) (rejecting defendant's challenge to voluntariness of his waiver when defendant waived *Miranda* rights and answered questions after "police informed him only that he was being arrested for the sexual assault" of one victim but not the murder of another; the Court held that his "waiver was not invalid simply because the officers did not inform him of every crime about which they would question him."). Because "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver" of his *Miranda* rights, *Spring*, 479 U.S. at 574, the superior court erred in determining that the detectives "violated [Baltierrez's] constitutional rights" by "refus[ing] to inform [him] about the nature of the investigation" when they questioned him after administering the *Miranda* warnings.

¶25 The court also based its suppression order in part on its finding that Baltierrez "was reportedly told by a juvenile probation officer that he was required to sign a form agreeing to speak with police." The State argues, and we agree, that this finding is not supported by the record.

¶26 At the hearing, De Santiago testified that before he met with Baltierrez, Bujanda told De Santiago that "there's a form they make the

juveniles sign" before they can be questioned by law enforcement. According to De Santiago, Bujanda stated that she "had to let the juvenile know" that the detectives wanted to question him, and "that there was a form that the juveniles [*sic*] had to sign."

¶27 De Santiago never testified, however, that Baltierrez was present during this conversation, or that anyone told Baltierrez that he "had to" sign the detained youth rights form. Likewise, Bujanda never testified that anyone told Baltierrez he was required to sign the form or to speak with the officers. On the contrary, she testified that Baltierrez "wouldn't have spoken to the officers if he wouldn't have agreed to." In the absence of any evidence that anyone ever told Baltierrez that he was required to sign a form or to speak with the police, we reject the court's finding to that effect as unsupported by the record. *See State v. Rosengren*, 199 Ariz. 112, 116, ¶ 9 (App. 2000) (noting deference only to "the trial court's factual findings that are supported by the record").

¶28 In suppressing Baltierrez's statements, the court found that he "was already in custody on another matter" at the time. Although the "length of detention and questioning" is a factor to consider when evaluating the voluntariness of a confession, *Andre M.*, 207 Ariz. at 485, ¶ 11 (citation omitted), the relevant "detention" is the detention attendant to the questioning that elicits the incriminating response. Incarceration for unrelated reasons does not, by itself, establish that an interviewee is "in custody" for *Miranda* purposes. *See Howes v. Fields*, 565 U.S. 499, 512 (2012) ("[S]ervice of a term of imprisonment, without more, is not enough to constitute *Miranda* custody."). The length of questioning is relevant to a voluntariness analysis in part because "the person who is questioned may be pressured to speak by the hope that, after doing so, he will be allowed to leave and go home." *Id.* at 511. That concern is not present when the person who is questioned is "a prisoner," since "he knows that when the questioning ceases, he will remain under confinement." *Id.*

¶29 Although Baltierrez had been at the detention facility for two weeks at the time of his interview, the recording of his interview indicates that his questioning by the detectives lasted only fifteen minutes before he invoked his rights. It is this fifteen-minute period of questioning, not Baltierrez's ongoing confinement, that is relevant for purposes of assessing the voluntariness of his statements. *See Maryland v. Shatzer*, 559 U.S. 98, 101, 112-13 (2010) (holding that prison inmate who was questioned about unrelated crime for approximately 30 minutes and then released back to the general prison population was no longer in "custody" for *Miranda* purposes; "*Miranda* was designed to guard against" the "coercive pressure"

that "results from the *interaction* of custody and official interrogation," and the defendant's return to "a baseline set of restraints imposed pursuant to a prior conviction" did not "create the coercive pressures identified in *Miranda*.") (emphasis in original, citations omitted).

**¶30** The only remaining factors found by the court in support of its suppression order are Baltierrez's "young age" and the fact that "neither a parent nor an attorney were present" at the interview. While these factors are indeed "relevant in assessing the voluntariness of a confession," *State v. Butler*, 232 Ariz. 84, 88, ¶ 15 (2013), we decline to affirm the suppression order based on these two factors alone. The weight to be given these factors depends, at least in part, on other factors about which the court made no findings. A parent's absence during an interrogation, for example, may be entitled to little weight if the juvenile affirmatively stated that he did not want the parent there. *Cf. State v. Ntiamoah*, 1 CA-CR 17-0683, 2019 WL 1715865, at *3, ¶ 14 (Ariz. App. April 16, 2019) (mem. decision) (affirming denial of juvenile's suppression motion and noting that juvenile "voluntarily, knowingly, and intelligently waived his mother's presence" by "answer[ing] 'no'" when asked if he "wanted his mother present"). Although the State presented evidence that Baltierrez answered "no" when asked if he wanted a parent or guardian present, the court made no findings on this point. Likewise, while a parent's presence during an interrogation "can help ensure that a juvenile will not be intimidated, coerced or deceived," *Andre M.*, 207 Ariz. at 485, ¶ 11, a finding that a juvenile was not, in fact, intimidated by the interrogator may suggest that the parent's absence was of little moment. Although the State contends that Baltierrez was not merely assertive but "often combative" during his interview, the court made no findings about Baltierrez's manner during questioning, and we decline to do so in the first instance.

**¶31** In the absence of findings on a number of factors relevant to a determination of the totality of the circumstances, *see supra* ¶ 22, the suppression order cannot be affirmed based solely on Baltierrez's age and the absence of a parent during questioning. We therefore vacate it without prejudice to a new determination of the voluntariness of Baltierrez's statements based on a consideration of a totality of the relevant circumstances.

## CONCLUSION

¶32        We vacate the order suppressing Baltierrez's statements.



AMY M. WOOD • Clerk of the Court
FILED:        JR