930 P.2d 440

**STATE of Arizona, Appellee,**

v.

**Johnathan Andrew DOODY, Appellant.**

No. 1 CA–CR 94–0120.

Court of Appeals of Arizona,
Division 1, Department A.

Sept. 5, 1996.

Review Denied Jan. 14, 1997.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section and Crane McClennen, Assistant Attorney General, Phoenix, for Appellee.

Dershowitz & Eiger, P.C. by Victoria B. Eiger and Nathan Z. Dershowitz, New York City and Alan M. Dershowitz, Cambridge, MA and Peter Balkan, Phoenix, for Appellant.

## OPINION

McGREGOR, Judge.

Johnathan Andrew Doody appeals his convictions and sentences for nine counts of first degree murder, nine counts of armed robbery, one count of burglary, and one count of conspiracy to commit armed robbery. For the reasons stated below, we affirm Doody's convictions and sentences.

### I.

On the morning of August 10, 1991, members of the Wat Promkunaram Buddhist Temple discovered nine bodies inside the temple (the temple murders). The victims, including six Buddhist monks, lay face down in a circle, each shot in the head. Several of the victims had sustained additional, nonfatal shotgun wounds. Living quarters inside the temple had been ransacked, and items of personal property, including money, cameras, and stereo equipment, were missing. Police analysis of the bullets identified the murder weapon as a Marlin Model 60 .22 caliber rifle (Marlin rifle).

In September 1991, detectives received an anonymous tip implicating four men from Tucson (the Tucson Four) in the temple murders. During questioning, the suspects made inculpatory statements, based on which the state charged the Tucson Four with the temple murders.

In an attempt to locate the murder weapon, investigators issued an advisory directing all law enforcement agencies to report any Marlin rifles. Investigators subsequently received a report from Luke Air Force Base that a military officer had discovered a Marlin rifle during a search of a vehicle stopped in an unrelated incident. Investigators recovered the rifle from its owner, Rolando Caratachea, and later identified it as the temple murder weapon. Caratachea denied involvement in the temple murders and claimed that two minors, Doody and another friend, Alessandro Garcia, had borrowed the rifle shortly before the murders.

Officers located Doody on October 25, 1991, at a high school football game. Doody agreed to accompany the officers to the police station for questioning. After arriving at the station, the officers advised Doody of his

*Miranda* [1] rights. Doody indicated that he understood his rights and was willing to speak to the investigators without an attorney or his parents present.

Doody's interrogation began at 9:25 in the evening. Doody initially denied any knowledge of the events at the temple but, after two and one-half hours, made inculpatory statements and, after approximately four more hours of questioning, admitted to being at the temple on the night of the murders. Doody claimed that Caratachea and Garcia approached him with a plan to conduct a "war game," which entailed surrounding the temple without setting off the security system. Doody stated that he went to the temple with Caratachea, Garcia, and two others, George Gonzalez and his friend. Doody maintained that he had not intended to enter the temple but that, once past the security sensors, he followed the others inside. Doody stated that Caratachea, Garcia, Gonzalez, and the other participant ransacked the temple's living quarters and gathered the victims into the main room. Doody stated that one of the monks recognized Gonzalez, who then ordered Doody to go outside and confirm that the walls were sound-proof. Doody maintained that the shootings occurred while he was outside and that he did not know who fired the shots. Officers did not complete the interview until after 10:00 the next morning.

Officers also questioned Garcia on the night of October 25, 1991. Garcia initially invoked his right to remain silent but, after consulting his father, agreed to give a statement regarding his involvement in the temple murders. Garcia claimed that Doody conceived the plan to rob the temple and persuaded Garcia to join him. Garcia stated that, once inside the temple, Doody insisted they leave "no witnesses" and that, despite Garcia's attempts to dissuade him, Doody shot each of the victims in the head with a rifle he had borrowed from Caratachea. Garcia claimed that he panicked and fired his shotgun in the direction of the victims. Garcia maintained that only he and Doody participated in the robbery and murders.

Investigators searched Garcia's home and discovered several items taken from the temple. Investigators also found a shotgun, later determined to be the gun that fired the shotgun shells recovered at the crime scene. Based on the confessions and the evidence collected at Garcia's home, the state dismissed the charges against the Tucson Four and charged Doody and Garcia with the temple murders. Following a juvenile transfer hearing at which Caratachea testified that Doody and Garcia had borrowed his rifle shortly before the murders, the court ordered Doody and Garcia to stand trial as adults.

Early in the pretrial proceedings, Doody and Garcia moved to suppress their confessions. After a ten-day suppression hearing, the trial court denied both motions. Garcia thereafter entered a plea agreement, pursuant to which the state agreed not to pursue the death penalty and Garcia agreed to testify against Doody. In addition, Garcia pled guilty to nine counts of first degree murder and one count of burglary in connection with the temple murders, as well as one count of first degree murder in an unrelated homicide (the Cameron murder).

The state proceeded to trial against Doody. At trial, Garcia testified consistently with his interrogation statements. The trial court did not allow Doody to cross-examine Garcia regarding the Cameron murder or other unrelated and uncharged offenses that Garcia had committed with Caratachea, including a series of burglaries and conspiracy to commit murder and armed robbery (the Cruz offenses). After Caratachea invoked his fifth amendment right not to testify at Doody's trial, the trial court allowed Doody to read into evidence Caratachea's testimony from the juvenile transfer hearing, except those portions of the transcripts referring to Caratachea's prior crimes.

The jury ultimately convicted Doody on each count. With respect to the first degree murder charges, the verdicts revealed that the jury premised Doody's convictions on felony murder rather than premeditated murder. The trial court subsequently sentenced Doody to nine consecutive life terms

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

on the murder counts and eleven additional prison terms on the remaining counts.[2] Doody now appeals. We have jurisdiction pursuant to Arizona Revised Statutes Annotated (A.R.S.) section 12–120.21.

## II.

█ Doody asserts that the trial court erred by failing to suppress his confession. Prior to trial, the trial court conducted an evidentiary hearing to determine the admissibility of Doody's statements. The suppression hearing lasted ten days, with testimony on each day. Based on the evidence presented at the hearing, including testimony from the officers who questioned Doody and the audio tapes of Doody's interrogation, the trial court concluded that Doody confessed voluntarily and waived his constitutional rights knowingly and intelligently. We will not disturb the trial court's determination absent clear and manifest error. *State v. Lucas,* 146 Ariz. 597, 607, 708 P.2d 81, 91 (1985).[3]

### A.

█ Doody argues that the trial court should have suppressed his statements because the officers coerced him to confess. In Arizona, confessions are presumed to be involuntary, and the state must establish by a preponderance of the evidence that a defendant confessed voluntarily and freely. *State v. LaGrand,* 153 Ariz. 21, 26, 734 P.2d 563, 568, *cert. denied,* 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987). In assessing the voluntariness of a confession, we "look to the totality of the circumstances surrounding the

confession and determine whether the will of the defendant has been overborne." *State v. Lopez,* 174 Ariz. 131, 137, 847 P.2d 1078, 1084 (1992), *cert. denied,* 510 U.S. 894, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993). With respect to juvenile confessions,

> the "greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." Thus, we evaluate whether police conduct was coercive in the context of a juvenile confession by carefully scrutinizing not only the external circumstances under which the juvenile was questioned but also the juvenile's reasonably apparent cognitive abilities. We also consider other inherently coercive factors in the totality: the arguably coercive atmosphere of the police interrogation room; the focus of the investigation on defendant as the prime suspect; and police transportation to the station.

*State v. Jimenez,* 165 Ariz. 444, 449, 799 P.2d 785, 790 (1990) (citations omitted).

The trial court considered the factors set forth in *Jimenez.* At the time of questioning, Doody was seventeen and one-half years old and completing his junior year in high school. Doody told the officers that he maintained a B grade average. Doody participated in his high school honor guard and color guard and held a job at the Luke Air Force Base commissary. Doody spoke fluent, although lightly accented, English. Doody gave no indication of any mental disorder.[4]

---

**2.** Following a mitigation hearing, the trial court rejected the death penalty based on Doody's age, lack of prior criminal record, and the fact that, under the terms of his plea agreement, Garcia would not receive the death penalty despite the possibility that Garcia, rather than Doody, fired the fatal shots.

**3.** Doody urges this court to adopt a *de novo* standard of review, arguing that the audio tapes of Doody's complete interrogation provide us the same ability as the trial court possessed to evaluate the voluntariness of his confession. Determining the voluntariness of a confession is by nature an intensely factual inquiry, and we rely on the trial court's assessment not only of tangible evidence reproducible on appeal, but intangi-

ble evidence, including the credibility of witness testimony. *See State v. Chapple,* 135 Ariz. 281, 297 n. 18, 660 P.2d 1208, 1224 n. 18 (1983). Here, the officers who questioned Doody testified at the suppression hearing that Doody understood the *Miranda* warnings and that he remained alert and responsive throughout the extended interrogation. Only the trial judge could evaluate the impact and credibility of the officers' testimony, and we will not substitute our judgment for that of the trial court absent clear error.

**4.** On appeal, Doody points to evidence presented at the sentencing proceedings concerning his background and communication skills. We limit our review of the admissibility of Doody's confes-

The trial court also considered the external circumstances of the interrogation, specifically the time and duration of the interrogation, and concluded that, in light of the officers' testimony regarding Doody's demeanor and the court's own review of the audio tapes, the circumstances surrounding the interrogation did not warrant suppression.

■ Doody argues that the length of the interrogation, which began in the evening and continued for almost thirteen hours without significant breaks, indicates that he did not confess voluntarily. We consider the length of an interrogation in determining voluntariness particularly when, as is true here, the interview continues for a long period of time. However, the troublesome length of Doody's questioning does not, in itself, establish that the officers overcame Doody's will to resist confessing. *See State v. Taylor*, 112 Ariz. 68, 81, 537 P.2d 938, 951 (1975), *cert. denied*, 424 U.S. 921, 96 S.Ct. 1127, 47 L.Ed.2d 328 (1976) (characterizing seven-hour interrogation as "long" but upholding the statements as voluntary in the absence of evidence that a lack of food and sleep contributed to the statements). Other factors indicate that, despite the length of the interrogation, Doody confessed voluntarily. Although the entire interrogation lasted approximately thirteen hours, Doody admitted he had borrowed Caratachea's rifle at the time of the temple murders after approximately two and one-half hours of questioning. Doody admitted he had participated in the temple robbery after approximately six and one-half hours of questioning, and his description of the events at the temple spanned nearly two hours. During the remaining hours, the detectives reviewed Doody's testimony and probed for a connection to the Tucson Four.

Although Doody characterizes the tone of the interrogation as coercive, the audio tapes reveal a courteous, almost pleading style of questioning during most of the interview.

Each of the officers involved in the interrogation testified at the suppression hearing that Doody remained alert and responsive throughout the interrogation and did not appear overtired or distraught. Our review of the audio tapes confirms the officers' testimony. Because Doody exercised his right not to testify at the suppression hearing, neither the trial judge nor this court has any basis for assuming that he would have contradicted the officers' testimony. The record, both at the time of the suppression hearing and after trial, includes no evidence that calls into question the testimony that Doody remained alert and responsive. Moreover, both before and during the interrogation, the officers offered Doody food and drinks and accommodated his requests to use the restroom. For those reasons, we conclude that the length of Doody's interrogation, in itself, does not mandate a finding of involuntariness.

■ Doody argues further that the trial court should have suppressed his statements because he did not have a parent or guardian present at the interrogation. We consider whether a parent is present during the questioning of a juvenile in evaluating voluntariness, but a parent's absence does not, in itself, render a confession involuntary. *State v. Hardy*, 107 Ariz. 583, 584, 491 P.2d 17, 18 (1971). Moreover, the absence of a parent weighs less heavily when, as here, the juvenile has not requested a parent or other adult. *Jimenez*, 165 Ariz. at 452, 799 P.2d at 793. At the outset of the interrogation, detectives asked Doody whether he wanted to have his parents present during questioning. Doody responded that he did not care whether his parents were present and thereafter agreed to speak with the detectives alone.[5] In light of Doody's age and his specific consent to speak with the officers without his parents, we reject Doody's argument that the absence of a parent renders his confession inadmissible.

sion to the evidence before the trial court at the suppression hearing. *State v. Flower*, 161 Ariz. 283, 286 n. 1, 778 P.2d 1179, 1182 n. 1 (1989).

5. Doody argues on appeal that the officers took extraordinary steps to ensure that his father would not be available during the interrogation.

At the outset of the interrogation, Doody specifically declined to have his parents present and did not request that they be contacted at any point during the questioning. Thus, whether the state acted to prevent Doody's father from attending the interrogation could not have affected the voluntariness of Doody's statements.

Bearing in mind Doody's individual characteristics and the external circumstances of the interrogation, we turn to the conduct of the police in obtaining Doody's confession. To be voluntary, a confession must not be induced by threats or promises of benefit or leniency, no matter how slight. *State v. Williams*, 136 Ariz. 52, 56, 664 P.2d 202, 206 (1983). Doody argues that the officers elicited his confession improperly by promising not to divulge his statements to the other suspects. We disagree. "Before a statement will be considered involuntary because of a 'promise,' evidence must be established that (1) a promise of benefit or leniency was in fact made, and (2) the suspect relied on that promise in making the statement." *Lopez*, 174 Ariz. at 138, 847 P.2d at 1085 (citing *State v. Amaya–Ruiz*, 166 Ariz. 152, 165, 800 P.2d 1260, 1273 (1990), *cert. denied*, 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991)).

Applying the test set forth in *Lopez* and *Amaya–Ruiz*, we reject Doody's argument for two reasons. First, the detectives' statements did not constitute a "promise" because they "did not offer any benefit to the defendant in exchange for information." *State v. Hensley*, 137 Ariz. 80, 87, 669 P.2d 58, 65 (1983) (statement by officer that suspect's confession would not be admissible in court did not constitute a promise); *see Lopez*, 174 Ariz. at 138, 847 P.2d at 1085 (statement by officer that he would not play interrogation tapes for victim's mother did not constitute a promise). The trial court found, and we agree, that the officers assured Doody that his statements would not be disclosed to the other suspects because the officers believed Doody's fear of reprisal affected his willingness to talk. The detectives did not imply that the state would not prosecute Doody if he revealed the information or that the state would not use his statements against him in a subsequent prosecution. *See State v. Burr*, 126 Ariz. 338, 340, 615 P.2d 635, 637 (1980). Second, Doody fails to establish that he relied on the statements in confessing. *See Amaya–Ruiz*, 166 Ariz. at 165, 800 P.2d at 1273; *see also Utah v. Strain*, 779 P.2d 221, 227 (Utah 1989) (recognizing that, under totality of circumstances test, a threat or promise does not render confession inadmissible

absent reliance). For those reasons, we conclude that the trial court did not err in determining that "the statements by law enforcement that what defendant Doody said would not be told to others ... were not sufficiently compelling to overcome defendant Doody's will to resist confessing."

We also reject Doody's argument that the officers unfairly pressured him to confess. The officers used a variety of approaches in questioning Doody. They emphasized Doody's experience in the high school honor guard and color guard and appealed to his sense of honor as a soldier. At impasses in the interview, the police captain entered the interrogation room and likened himself to a commanding officer in the military, encouraging Doody to trust and confide in him. The officers feigned empathy with Doody's situation and pleaded with Doody to prove his innocence. The officers also indicated to Doody that other suspects had implicated him in the temple murders and that Doody's best defense would be to explain his version of the events.

In *State v. Carrillo*, 156 Ariz. 125, 750 P.2d 883 (1988), the court addressed the propriety of deceptive interrogation tactics:

> The very nature of law enforcement encourages police to use some artifice and trickery in their work. *Miranda* curtailed many of the most egregious practices, such as the infamous "third degree." However, courts still tolerate some police gamesmanship, *so long as the games do not overcome a suspect's will and induce a confession not truly voluntary.*

*Id.* at 136, 750 P.2d at 894 (emphasis added) (citations omitted). The trial court correctly characterized portions of Doody's interrogation as "aggressive, energetic [and] forceful" but concluded that "the method and style used by law enforcement in questioning defendant Doody was permissible, i.e., lawful...." We agree. The officers conducting Doody's interrogation made no improper promises or threats and, although Doody did not speak for long periods during the interrogation, he never invoked his right to remain silent or his right to an attorney. The tactics, though deceptive in part, were not so

egregious as to overcome Doody's will and, as discussed above, the record contradicts Doody's claim on appeal that the method of interrogation induced him to confess. With respect to the officers' statements that Doody's best defense would be to explain his involvement in the temple murders before the other suspects placed primary blame on him, we note that "[a]dvice to tell the truth, unaccompanied by either a threat or promise, does not make a confession involuntary." *State v. Ross*, 180 Ariz. 598, 603, 886 P.2d 1354, 1359 (1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995).

For these reasons, we conclude that the trial court did not abuse its discretion by admitting Doody's confession. Moreover, the trial court's decision to admit the confession did not constitute the final determination of voluntariness. In this case, as in all others, the jury was "the ultimate arbiter of voluntariness, and [was] free, in effect, [to] disagree with the judge, and reject the confession." *State v. Gretzler*, 126 Ariz. 60, 84, 612 P.2d 1023, 1047 (1980) (quotation omitted). The trial judge instructed the jury that Doody's statement was not voluntary if it resulted from his "will being overcome by a law enforcement officer's use of any sort of violence, coercion, or threats, or by any direct or implied promise, however slight." The judge told the jury to give Doody's statement whatever weight it deserved under all the circumstances. Following those instructions, the jury either found the confession voluntary and gave it appropriate weight or convicted Doody on the basis of other evidence.

### B.

■ Doody also argues that the trial court should have suppressed his confession because the officers did not inform him sufficiently of his rights before questioning him. To be admissible, "a confession must not only be free from coercion, but the defendant's waiver of his constitutional rights must be knowing and intelligent." *Jimenez*, 165 Ariz. at 449, 799 P.2d at 790. The Arizona Rules of Procedure for the Juvenile Court govern. the admissibility of juvenile confessions, including statements made by a juvenile later charged as an adult:

No extra-judicial statement to a peace officer by the child shall be admitted into evidence in juvenile court over objection unless the person offering the statement demonstrates to the satisfaction of the court that: The statement was voluntary and before making the statement the child was informed and intelligently comprehended that he need not make a statement, that any statement made might be used in a court proceeding, and that he had a right to consult with counsel prior to making a statement and during the taking of the statement, and that, if he or his parents, guardian or custodian could not afford an attorney, the court would appoint one for him prior to any questioning.

Ariz. R. Juv. Ct. P. 18; *see Jimenez*, 165 Ariz. at 450, 799 P.2d at 791. We determine whether extra-judicial statements resulted from a knowing and intelligent waiver of rights by considering whether, in light of the totality of circumstances, the officers "imparted a clear, understandable warning of all defendant's rights ... in language the defendant could comprehend and on which he could intelligently act." *State v. Mumbaugh*, 107 Ariz. 589, 597, 491 P.2d 443, 451 (1971).

The state initially argues that Doody waived his claim of error with respect to the adequacy of the *Miranda* warnings because he did not challenge the trial court's finding that he was not in custody. *See id.* at 593, 491 P.2d at 447 (explaining that, although warnings must precede custodial interrogations, no warnings are necessary for noncustodial questioning because "[w]here [a] defendant is not in custody or deprived of his freedom his answers are not deemed compelled....").

The state's waiver argument relies on an overbroad reading of the trial court's findings. The trial court's factual findings resolved only the limited issue that Doody "was not under arrest or in custody *when he was transported to the task force offices for questioning* on October 25, 1991." Contrary to the state's assertion, the trial court did not address whether Doody was in custody during the interrogation. Doody's failure to

challenge the trial court's narrow finding that he was not in custody prior to the interview does not constitute a waiver of his argument that the officers failed to advise him sufficiently of his rights before obtaining his inculpatory statements. For purposes of review, we accept Doody's characterization of the questioning as a custodial interrogation requiring *Miranda* warnings.

Again considering the circumstances in their totality, we conclude that the trial court did not err in determining that the officers advised Doody of his *Miranda* rights in a clear and understandable manner and that Doody made a knowing and intelligent waiver. At the outset of the interrogation, the officers advised Doody of his rights under *Miranda* and of his right to have a parent or guardian present during questioning. The officers also advised Doody of the possibility he later could be transferred to adult court. The officers read each warning from a standard juvenile form and provided additional explanations as appropriate. After reading each warning, the officers asked Doody if he understood the right involved and obtained his initials on the form. Although Doody had no prior experience with the criminal justice system, the officers explained the rights in a manner appropriate for his age and apparent intelligence.

The officers testified at the suppression hearing that Doody appeared to understand the warnings and exhibited no signs of doubt or confusion. Based on that testimony and the court's review of the taped interrogation, the trial court concluded that the officers adequately advised Doody of his rights and obtained an appropriate waiver before continuing. In so holding, the trial court expressly considered Doody's age, intelligence, and lack of prior exposure to the criminal justice system. Our review of the record, including the audio tape of the warnings, supports the trial court's finding that Doody knowingly and intelligently waived his rights, and therefore we will not disturb the court's ruling.

### III.

■ Doody next challenges the trial court's evidentiary rulings pertaining to testi-mony from the Tucson Four. Doody argues that the trial court erred by permitting him to present the confessions of the Tucson Four only to establish and argue the truth of their confessions. Had he not been so limited, Doody asserts, he could have presented evidence of improprieties in the Tucson Four interrogations and could have proved and argued that his own confession, which he attributes to "the same police officers using many of the same interrogation techniques," was false, as were the Tucson Four confessions. Doody's argument on appeal that testimony from and confessions by the Tucson Four were admissible to show his confession was involuntary, however, is not only different from but also inconsistent with the basis on which Doody urged their admissibility in the trial court. Because a party may not assert an evidentiary theory for the first time on appeal, *State v. Serna*, 163 Ariz. 260, 267, 787 P.2d 1056, 1063 (1990), we reject this argument.

The question whether Doody could use the Tucson Four confessions first arose in the context of a motion in limine through which the state sought to preclude the defense from using statements by the Tucson Four. The state, not Doody, argued the Tucson Four statements should be excluded as unreliable and irrelevant. In response, Doody asserted the statements were relevant to his defense that the Tucson Four, not Doody, committed the temple murders and that a reasonable person could believe their confessions to be true. Doody gave no indication whatever that he intended to use the statements to establish that, because the Tucson Four confessions were not reliable, Doody's admissions also were not reliable. Moreover, as is self-evident, such an argument would have been inconsistent with the basis on which Doody had argued the trial court should admit the statements.

After hearing argument, the trial court agreed with Doody. The court first found the statements clearly relevant to whether the Tucson Four or Doody committed the temple murders and then weighed the probative value against the prejudicial effect of the statements. Commenting that the jury would determine the credibility and volun-

tariness of the Tucson Four statements, the court determined that the statements would be admissible if the declarants were unavailable at trial.

Two of the Tucson Four, Mark Nunez and Leo Bruce, testified for Doody. Defense counsel questioned Nunez about the circumstances of his arrest and interrogation. During argument in chambers, Doody justified his examination into these areas by stating that he had two reasons for presenting the information. First, he wanted the jury to understand that the defense was presenting the full story, which he thought would add to the credibility of the defense. Second, since the prosecution intended to argue that the statements were unreliable, Doody wanted to "draw the sting." As had been true during earlier proceedings, Doody did not assert any intention of drawing parallels between the Tucson Four and the Doody interrogations.

Both Doody and the prosecution then questioned Nunez and Bruce extensively about the circumstances surrounding their interrogations and the content of their confessions. After the court found that Michael McGraw and Dante Parker, the remaining members of the Tucson Four, were unavailable as witnesses, the jury heard the audio recording of Parker's questioning and the court admitted into evidence McGraw's statement.

During a conference among the trial judge and lawyers, held outside the presence of the jury several days after the Tucson Four testimony ended, Doody asserted that, if the prosecution intended to suggest that Doody's confession was reliable because the officers had discontinued the abusive practices used in the Tucson Four interrogations, the trial court should allow Doody to present evidence of "continuing abuses and similarities" in his own interrogation. At that point, the trial court commented that what occurred in the Tucson Four case was not relevant to the validity of Doody's statements. The court emphasized, as it had on several other occasions, that Doody could present to the jury any evidence related to his confession that would render it unreliable, including all the circumstances surrounding his confession.

Doody now asserts that the trial court, by foreclosing an argument that his confession, like those of the Tucson Four, was false, violated the principles set forth in *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). We reject Doody's argument for several reasons. First, *Crane* does not apply. There, the Court held that a trial court may not exclude evidence concerning the manner in which the police obtain a defendant's confession because the environment that yields a confession bears on its reliability. *Id.* at 689, 106 S.Ct. at 2146. The trial court here fully complied with that holding. The jury heard the audio tapes of Doody's entire interrogation. All officers involved in taking his statement testified. The trial court excluded no evidence concerning the manner in which the police obtained Doody's confession. Moreover, contrary to Doody's statements on appeal, the trial court permitted Doody to present substantial evidence about the circumstances surrounding the interrogations of the Tucson Four. As noted above, two of the Tucson Four testified extensively about their interrogations, and the jury heard the tape of a third interrogation. Doody made no offer of proof as to any additional evidence he wanted to introduce with respect to the circumstances surrounding the Tucson Four confessions, and therefore provides no basis for further review by this court. *See* Ariz. R. Evid. 103(a); *see also Jones v. Pak–Mor Mfg. Co.*, 145 Ariz. 121, 129, 700 P.2d 819, 827, *cert. denied*, 474 U.S. 948, 106 S.Ct. 314, 88 L.Ed.2d 295 (1985).

Second, Doody failed to preserve for appeal the issue whether the trial court should have admitted Tucson Four evidence as relevant to establish the truth or falsity of Doody's confession. Arizona, like most other jurisdictions, has never held that showing the police obtained a false or involuntary confession from one defendant proves whether a second defendant's confession is false or involuntary. Assuming, without deciding, that substantial similarity of circumstances, interrogators, and defendants could render the voluntariness of one confession relevant to the issue of another confession's voluntariness, we find that Doody made no such showing in this case. Doody cites to no portion of

the record, and our own review has disclosed none, in which he identified for the trial court the similarities between his interrogation and those of the Tucson Four that he now regards as sufficient to support his argument that the truthfulness of one is probative of the truthfulness of the other. Indeed, the record does not support even those general references Doody makes on appeal. For instance, although Doody categorically states on appeal that his confession was "obtained by the same police officers using many of the same interrogation techniques" used with the Tucson Four, the record discloses substantial differences in approach and questioners. Doody also made no offer of proof describing the evidence he would offer to establish a link between interrogation techniques and falsity of statements.

Doody's averments to the court that he intended to present the Tucson Four evidence to establish the truth of their confessions, his failure to offer the Tucson Four evidence for the purpose of proving the falsity of his confession, and his failure to define which similarities he regarded as providing sufficient basis for comparing the confessions, lead us to conclude that Doody waived this argument on appeal.

### IV.

■ Doody next argues that the trial court erred by restricting his cross-examination of Garcia with respect to unrelated crimes Garcia committed before and after the temple murders. Although the right to cross-examine a witness is vital to the right of confrontation, the trial court reserves discretion to curtail the scope of cross-examination to within "reasonable" limits. *State v. Fleming,* 117 Ariz. 122, 125, 571 P.2d 268, 271 (1977). We review a trial court's order restricting the scope of cross-examination on a case-by-case basis to determine whether the court unduly inhibited the defendant's ability to present information bearing on issues or on the credibility of witnesses. *Id.* The trial court exercises considerable discretion in determining the proper extent of cross-examination, and we will not disturb the court's ruling absent a clear showing of

prejudice. *State v. Rodgers,* 134 Ariz. 296, 301, 655 P.2d 1348, 1353 (App.1982).

■ Doody contends that the trial court improperly prohibited him from cross-examining Garcia about the details of the Cameron murder. Doody argued at trial that the details of the Cameron murder illustrated Garcia's motive and bias because, due to the aggravating factors of the Cameron murder, Garcia would have received the death penalty for that crime. If the details of the Cameron murder were admitted, Doody asserted, the evidence would demonstrate the extent of the benefit Garcia received under the terms of his plea agreement, which prohibited imposition of the death penalty. The court correctly rejected the introduction of the Cameron murder evidence, however, because the circumstances surrounding the Cameron murder were relevant only to whether a trial judge would have imposed the death penalty in a separate trial for that crime. *See* A.R.S. § 13–703. The trial court allowed Doody to illuminate the full extent of the benefit Garcia received by agreeing to testify against Doody. Graphic details of the Cameron murder would have added nothing of relevance to establish Garcia's motive or bias, and the trial court did not abuse its discretion by limiting Doody's cross-examination as to the details of the Cameron murder.

■ Doody next argues that the trial court erroneously prohibited him from cross-examining Garcia about the Cruz offenses. At trial, Doody argued that evidence disclosing the details of the Cruz offenses would further illustrate the benefit Garcia received under his plea agreement because, although the plea agreement did not encompass the Cruz offenses, Garcia may have anticipated that the state would not prosecute him for those crimes in exchange for his testimony against Doody. Again, the trial court allowed Doody to question Garcia regarding the benefits he anticipated as part of his plea agreement, including whether he believed he would be exempt from prosecution for the Cruz offenses. As with the Cameron murder, the details of the Cruz offenses would have added nothing relevant to Garcia's motive or bias. We therefore affirm the court's ruling.

Doody also argues that the trial court should have allowed him to cross-examine Garcia about the Cruz offenses and other burglaries Garcia committed with Caratachea to impeach Garcia's character for truthfulness. Doody did not argue impeachment as a basis for admissibility, however, until this appeal. At trial, Doody argued only that evidence of past conduct involving Garcia and Caratachea was admissible to prove that Caratachea participated in the temple murders. The trial court correctly rejected Doody's proposed evidence as irrelevant, unduly prejudicial, and inadmissible under Rule 404(b) of the Arizona Rules of Evidence.

This court generally does not review evidentiary theories raised for the first time on appeal. *Serna*, 163 Ariz. at 267, 787 P.2d at 1063. In any event, we find no merit to impeachment as a basis for cross-examining Garcia regarding the Cruz offenses or the burglaries. On cross-examination, a party may inquire into specific instances of a witness's prior conduct for impeachment purposes only if the conduct is probative of the witness's character for truthfulness. Ariz. R. Evid. 608(b); *State v. Woods*, 141 Ariz. 446, 449, 687 P.2d 1201, 1204 (1984). Because Doody provides no support for his assertion that Garcia's past conduct bears any relation to his character for truthfulness, we find no error in the court's limitation of his cross-examination.

Doody argues alternatively that evidence of Garcia's past conduct with Caratachea establishes Garcia's motive and bias to implicate Doody and exculpate Caratachea in the temple murders. Doody also did not assert motive or bias as a basis for admissibility during trial proceedings and, as stated above, failure to argue an evidentiary theory in the trial court constitutes a waiver on

appeal. *Serna*, 163 Ariz. at 267, 787 P.2d at 1063. Moreover, we find no merit in Doody's argument that Garcia's history of criminal activity with Caratachea influenced Garcia to favor Caratachea over Doody, given the fact that Doody also allegedly participated in at least some of the criminal activity.[6]

Doody also argues that the trial court erred by prohibiting him from establishing that Garcia had used the phrase "no witnesses" in connection with the Cameron murder. We find the limitation falls well within the trial court's discretion. Doody maintains that Garcia's use of the phrase "no witnesses" in the Cameron murder, which occurred shortly after the temple murders, supports the proposition that Garcia, rather than Doody, executed the temple victims so that "no witnesses" would remain. However, the trial court allowed Doody to question Garcia about his use of the phrase "no witnesses," and Garcia acknowledged at trial that he had used the phrase "no witnesses" after the temple murders. Moreover, Doody makes no showing of prejudice stemming from the court's limitation on his ability to link Garcia's use of the phrase "no witnesses" specifically to the Cameron murder. If any error occurred, it was harmless and provides no basis for reversal.

## V.

Doody next contends that the trial court erroneously permitted Caratachea to invoke his right to remain silent.[7] Doody argues that Caratachea waived his right by testifying under oath at Doody's juvenile transfer hearing. We disagree.

A waiver of the fifth amendment privilege affects only the particular proceed-

---

**6.** In support of his claim of error, Doody relies upon *United States v. Robinson*, 530 F.2d 1076 (D.C.Cir.1976). That decision recognizes that a trial court exercises discretion in deciding whether to permit cross-examination concerning other criminal activities to establish a witness's bias or motive to lie. In *Robinson*, the court merely concluded that the trial court did not abuse its discretion in admitting such evidence, after balancing the probative value against the prejudicial effect of the evidence. Moreover, the evidence at issue in *Robinson* involved "an ongo-

ing affair related in subject matter and time to the transactions charged against defendant." *Id.* at 1081. In contrast, no direct connection exists between the temple murders and the other offenses involving Garcia and Caratachea. Under these circumstances, the trial court did not abuse its discretion in rejecting Doody's attempt to cross-examine Garcia about other uncharged criminal offenses.

**7.** U.S. Const. amend. V.

ing in which the waiver occurs. *Nelson v. Hannah,* 122 Ariz. 296, 297, 594 P.2d 550, 551 (App.1979) (citing *Ottomano v. United States,* 468 F.2d 269 (1st Cir.1972), *cert. denied,* 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973)). Caratachea's waiver of his fifth amendment right at the juvenile transfer hearing, a proceeding separate from the trial, did not constitute a waiver of his right to refuse to testify at trial. *See United States v. Licavoli,* 604 F.2d 613, 623 (9th Cir.1979), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980) (holding that a witness may invoke the privilege against self-incrimination at trial despite testifying previously before a grand jury in the same case). Juvenile transfer hearings, like grand jury proceedings, determine whether further proceedings are appropriate; the testimony of a witness at a juvenile transfer hearing, like testimony at a grand jury proceeding, does not compromise the witness's later right to refuse to testify at trial in the same case.

■ Doody argues alternatively that Caratachea could claim no fifth amendment privilege with respect to certain burglaries for which he already had been adjudicated and that the trial court therefore should have required him to invoke his fifth amendment privilege with respect to his involvement in the temple murders in the presence of the jury. We disagree. In *State v. McDaniel,* 136 Ariz. 188, 665 P.2d 70 (1983), the court held that if "a witness could legitimately refuse to answer essentially all relevant questions, then that witness may be totally excused without violating an individual's Sixth Amendment right to compulsory process." *Id.* at 194, 665 P.2d at 76. Here, the trial court disallowed evidence concerning Caratachea's previously adjudicated burglaries on the basis of relevance. *McDaniel* supports the trial court's decision because Caratachea legitimately could refuse to answer all *relevant* questions and therefore could be excused from invoking his right in front of the jury. Because Doody offers no convincing argument to establish the relevance of those burglaries, we find no error.

■ Doody further argues that the trial court erred in redacting Caratachea's prior testimony to eliminate references to Caratachea's prior crimes and misconduct. Doody contends that the trial court should have admitted evidence of Caratachea's criminal history for impeachment purposes. On appeal, Doody states that "Doody's counsel argued vigorously that it was improper to excise from Caratachea's prior testimony references to his myriad of other crimes, conduct with which Caratachea had been impeached by both the state and the defendant when he originally gave that testimony." The only citation to the record Doody provides refers this court to the transcript of Caratachea's prior testimony as redacted. Failure to provide citation to the record in support of an argument, as required by Rule 10(c)(1) of the Arizona Rules of Criminal Appellate Procedure, justifies this court in disregarding the argument. However, we have independently reviewed the objections Doody made to redaction. At no point did Doody object to the redaction of Caratachea's testimony regarding Caratachea's prior conduct on the basis that he wished to use the evidence for impeachment. Failure to preserve impeachment as a basis for admissibility waives the issue on appeal. *See Serna,* 163 Ariz. at 267, 787 P.2d at 1063.

■ Finally, Doody argues that the trial court erred in permitting the state to withhold immunity from Caratachea while granting immunity to several prosecution witnesses. The state exercises sole discretion in granting immunity to witnesses. *State v. Fisher,* 141 Ariz. 227, 243, 686 P.2d 750, 766, *cert. denied,* 469 U.S. 1066, 105 S.Ct. 548, 83 L.Ed.2d 436 (1984). The state's refusal to grant a particular witness immunity does not violate a defendant's right to due process absent prosecutorial misconduct or, alternatively, a showing that the witness would present clearly exculpatory evidence and that the state has no strong interest in withholding immunity. *State v. Axley,* 132 Ariz. 383, 388, 646 P.2d 268, 273 (1982). Neither of those exceptions applies here, and we find no error.

## VI.

■ Doody argues next that the trial court erred in its evidentiary rulings exclud-

ing testimony from James Herron. Prior to trial, Herron gave a sworn statement to investigators, in which he recounted conversations with Caratachea while they were in juvenile detention together. In the statement, Herron claimed that Caratachea had told him that Garcia, not Doody, shot the victims and that Doody believed he was participating in a war game at the temple. Herron also stated that Caratachea had boasted that his autograph would be valuable some day because of his involvement in the temple murders. Herron provided the officers a slip of paper bearing Caratachea's signature as proof of the conversations. After Herron repeated his statements in a pretrial defense interview, Doody subpoenaed Herron to testify at trial. Herron failed to appear pursuant to the subpoena, however, and the trial court ruled that his sworn statement constituted inadmissible hearsay.

Herron's sworn statement contains two layers of hearsay, Caratachea's statements to Herron and Herron's statements to the investigators. We will uphold the trial court's exclusion of the sworn statement if either level fails to qualify for admission as an exception to the hearsay rule. See Ariz. R. Evid. 805; State v. McGann, 132 Ariz. 296, 298 n. 1, 645 P.2d 811, 813 n. 1 (1982). Doody argues that the exception for statements against interest applies to Caratachea's statements to Herron and that the residual hearsay exception for unavailable witnesses applies to Herron's sworn statement to the investigators.

The exception for statements against interest, set forth in Rule 804(b)(3), creates an exception for

> [a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clear-*

*ly indicate the trustworthiness of the statement.*

Ariz. R. Evid. 804(b)(3) (emphasis added). Because Caratachea's statements to Herron implicated him in the temple murders and were offered to exculpate Doody, the statements are inadmissible unless corroborating circumstances ensure the statements' trustworthiness.

In *State v. Lopez,* 159 Ariz. 52, 764 P.2d 1111 (1988), the court defined the standard for assessing the admissibility of a statement against interest:

> The trial judge should examine both the corroborating evidence and the contradictory evidence. The judge's inquiry should be limited to the question of "whether evidence in the record corroborating and contradicting the declarant's statement would permit a reasonable person to believe that the statement could be true." If the judge determines that a reasonable person could conclude that the statement could be true, the evidence comes in for the jury's consideration.

*Id.* at 54–55, 764 P.2d at 1113–14 (citations omitted) (quoting *LaGrand,* 153 Ariz. at 27, 734 P.2d at 569). Here, Caratachea's signature provides the only evidence corroborating his statements to Herron. At best, the signature corroborates that a conversation between Caratachea and Herron occurred; the signature provides little corroboration for the substance of the conversation. Moreover, even if we were to regard the signature as providing the necessary corroboration to render Caratachea's statements to Herron admissible, the trial court correctly excluded Herron's account of Caratachea's statements, the outer layer of hearsay, as inadmissible.

■ Doody concedes that Herron's sworn statement summarizing his conversations with Caratachea fails to qualify for admission as former testimony under Rule 804(b)(1). Doody argues, however, that the trial court should have admitted Herron's sworn statement under the residual hearsay exception for unavailable witnesses, set forth in Rule 804(b)(5). The "catch-all" provision of Rule 804(b)(5) provides an exception for statements not covered by an established hearsay exception but "having equivalent circumstan-

tial guarantees of trustworthiness...." Ariz. R. Evid. 804(b)(5). Thus, a statement proffered pursuant to Rule 804(b)(5) must have "particularized guarantees of trustworthiness" that the statement is "at least as reliable as evidence admitted under a firmly rooted hearsay exception." *State v. Luzanilla,* 179 Ariz. 391, 394, 880 P.2d 611, 614 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1406, 131 L.Ed.2d 293 (1995). To assess whether a statement bears the requisite indicia of trustworthiness, the trial court "may not consider corroborating evidence, but must instead look to 'the totality of circumstances ... that surround the making of the statement and that render the declarant particularly worthy of belief.'" *Id.* (quoting *Idaho v. Wright,* 497 U.S. 805, 819, 110 S.Ct. 3139, 3148, 111 L.Ed.2d 638 (1990)).

Doody sets forth the following factors as indicative of the sworn statement's reliability: (1) Herron made the statement voluntarily and under oath, (2) Herron did not know Doody and therefore had no motive to lie, (3) Herron's statement was taken by police officers and recorded by a court reporter, and (4) Herron made similar statements in other interviews. However, other factors cast doubt on the reliability of Herron's statement.

The trial court reviewed sealed documents describing Herron's mental condition and juvenile record, which related to his credibility. Although Herron made his statement under oath, "giving an oath prior to testifying, in and of itself, is not a circumstance making it highly unlikely for a person to lie—at least so unlikely that cross-examination would add little." *Luzanilla,* 179 Ariz. at 394–95, 880 P.2d at 614–15. Considering all the circumstances surrounding Herron's sworn statement, we find no error in the trial court's conclusion that Doody failed to make the requisite showing of reliability. Additionally, Herron's sworn statement does not constitute the type of rare or exceptional evidence contemplated by Rule 804(b)(5). *See id.* at 398, 880 P.2d at 618 (explaining that evidence "generally admissible under Rule 804(b)(1) but for its missing element" is not the type of evidence for which Rule 804(b)(5) provides an exception to the hearsay rule). For those reasons, we conclude that the trial court properly excluded Herron's sworn statement as inadmissible hearsay.

■ Doody next challenges the trial court's refusal to reopen the trial to accept Herron's testimony. Following closing arguments, the trial court heard, through several layers of informants, that Herron may have agreed to surrender the next day. The court nevertheless proceeded to instruct the jury. When Herron later arrived at the court, Doody moved to reopen his case to present Herron's testimony. The trial court denied Doody's motion.

■ The trial court exercises its discretion in evaluating a motion to reopen. *State v. Thomas,* 110 Ariz. 120, 131, 515 P.2d 865, 876 (1973). In deciding whether to reopen, the trial court should consider whether "all the evidence, offered in good faith and necessary to the ends of justice has been heard." *State v. Mendoza,* 109 Ariz. 445, 448, 511 P.2d 627, 630 (1973) (quoting *State v. Favors,* 92 Ariz. 147, 149, 375 P.2d 260, 261 (1962)). We find no abuse of discretion in the trial court's decision not to reopen.

As discussed above, the subject of Herron's proposed testimony, Caratachea's statements, may well have constituted inadmissible hearsay. Even if admissible, Herron's testimony had little probative value. In his statement, Herron claimed that Caratachea told him that Doody believed he was playing a war game. However, Herron then clarified that Caratachea said that the war game included robbing the temple. Herron's statement also indicated that Doody was not tricked into participating in the events at the temple, as Doody claimed. In ruling against reopening, the trial court considered the attenuated nature of the proposed evidence, weighed against the prejudicial effect of allowing more testimony to be heard and conducting additional closing arguments, coupled with the suspicious timing of Herron's arrival. The trial court was in a far better position than are we to determine the impact on the jury of reopening the trial, after closing arguments and instructions, for testimony from one witness. In light of the court's concerns, we cannot conclude that the trial court's decision constituted clear and manifest error.

Further, because the jury rejected the premeditated murder charges, any error in failing to reopen the case to accept Herron's testimony constitutes harmless error. Error is harmless "if we can say, beyond a reasonable doubt, that the error did not contribute to or affect the verdict." *State v. Bible*, 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993), *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994). At best, Herron's testimony would have established that Doody believed he was participating in a war game to rob the temple, which may have negated premeditation. Herron's testimony, however, directly inculpated Doody on the charges of felony murder, the basis on which he was convicted. If Herron had testified, the effect would have been to strengthen the felony murder evidence against Doody. We therefore conclude, beyond a reasonable doubt, that the alleged error did not contribute to or affect the verdict.

### VII.

For the reasons stated above, we affirm Doody's convictions and sentences.

WEISBERG, P.J., and TOCI, J., concur.