NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

JOHNATHAN ANDREW DOODY, *Appellant.*

No. 1 CA-CR 14-0218
FILED 11-10-2015

Appeal from the Superior Court in Maricopa County
No. CR 1992-001232
The Honorable Joseph Kreamer, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

The Hopkins Law Office, PC, Tucson
By Cedric Martin Hopkins
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Acting Presiding Judge Jon W. Thompson delivered the decision of the Court, in which Judge Lawrence F. Winthrop and Judge Peter B. Swann joined.

---

**T H O M P S O N**, Judge:

**¶1** Johnathan Andrew Doody murdered nine people inside a Buddhist temple in 1991. A jury found Doody guilty of nine counts of first degree murder, nine counts of armed robbery and one count each of first degree burglary and conspiracy to commit armed robbery and/or first degree burglary. The trial court sentenced Doody to nine consecutive terms of life imprisonment with a possibility of parole after twenty-five years for the murder counts and a consecutive, aggregate term of twelve years' imprisonment for the remaining counts.[1]

**¶2** Doody does not challenge the sufficiency of the evidence to support his convictions. He contends, however, that the trial court erred when it denied Doody's motion in limine to admit evidence of a subsequent murder and when it failed to consider mitigating circumstances for sentencing purposes. For the reasons that follow, we affirm Doody's convictions and sentences. We have jurisdiction pursuant to Arizona Constitution, Article 6, Section 9, and Arizona Revised Statutes (A.R.S.) sections 12-120.21(A) (2003), 13-4031 (2010) and 13-4033 (2010).

### I. Doody's Motion in Limine

**¶3** Doody first argues the trial court erred when it denied his motion in limine to admit evidence of the details of a tenth murder that occurred approximately nine weeks after the "temple murders." We

---

[1] This was Doody's third trial in this matter. The United States Court of Appeals for the Ninth Circuit reversed Doody's original 1993 convictions after it found interrogators did not adequately inform Doody of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and because the methods of interrogation rendered his confession to the murders involuntary. *Doody v. Ryan*, 649 F.3d 986, 1023 (9th Cir. 2011). A second trial in 2013 resulted in a mistrial.

review a trial court's evidentiary rulings for abuse of discretion. *State v. Amaya-Ruiz*, 166 Ariz. 152, 167, 800 P.2d 1260, 1275 (1990).

### A. Background

¶4 We first clarify the record to put the issue and Doody's arguments in context. A second person, "Garcia," participated in the temple murders. In exchange for the state's agreement not to seek the death penalty, Garcia pled guilty to nine counts of first degree murder and agreed to testify truthfully in any proceedings against Doody. The court sentenced Garcia to nine consecutive terms of life imprisonment with a possibility of parole after twenty-five years. Garcia ultimately testified at trial that Doody shot each of the murder victims individually with a rifle as they lay on the floor and Garcia fired into the group of victims four times with a shotgun.

¶5 Doody filed a pretrial motion in limine to admit evidence of the details of a tenth murder Garcia participated in as an accomplice. Nine weeks after the temple murders, the sixteen-year-old Garcia and his fourteen-year-old girlfriend ran away together. They encountered the tenth victim at a campsite and borrowed matches from her. Garcia planned to rob the tenth victim shortly thereafter and repeatedly told his girlfriend there should be "no witnesses" once they did so. Garcia pressured his girlfriend to kill the tenth victim, and told her, "If you love me, you'll do this." The girlfriend shot the tenth victim twice in the back with a nine millimeter handgun, after which they took the victim's money and ATM card. The girlfriend admitted she shot the victim but claimed Garcia controlled everything, that it was all his plan and that he manipulated her. Garcia revealed the tenth murder to investigators as part of his plea agreement in the instant case. Garcia pled guilty to that murder as well and received a tenth, consecutive sentence of life imprisonment with a possibility of parole after twenty-five years.

¶6 Doody alleged in his motion in limine that there were similarities between the temple murders and the tenth murder. Relying on Arizona Rule of Evidence 404(b) (Rule 404(b)), Doody asserted these alleged similarities were relevant to Garcia's motive and intent and would impeach Garcia's trial testimony by showing Garcia's "common scheme or plan" to minimize his involvement in any murder he participated in, attribute the actual murder to another person and portray himself as simply a follower. At the hearing on the motion, Doody argued further that the evidence was relevant to show Garcia was a "serial killer" who "cuts deals with the state, implicates others in exchange for favorable outcome for

himself, . . . minimizes his involvement in the crimes as he did in both the [tenth murder] and the temple murders and he manipulates people." He also argued the evidence showed Garcia has a "character trait for, basically, implicating other people; cutting deals; minimizing his involvement." Finally, Doody argued the evidence that Garcia used the phrase "no witnesses" in the tenth murder was most important because he would testify it was Doody who used that phrase during the temple murders.

¶7            The trial court denied the motion in limine in part and granted it in part. The court held it would allow some evidence of the tenth murder. The court held Doody could introduce evidence that Garcia participated in the tenth murder, "cut deals" with law enforcement, entered into plea agreements, implicated other people and minimized his involvement in all ten murders. The court would not, however, allow Doody to introduce evidence of the details of the tenth murder. The court held Rule 404(b) was not designed to permit a party to "dredge up every bad thing [a] person has done." The court found Doody's attempt to admit the details of the tenth murder was "simply an argument that, boy, Garcia is a bad guy; he's a bad guy, don't listen to him." The court also held it was "running into a big [Arizona Rule of Evidence] 403 wall" with the details of the tenth murder. Regarding Garcia's use of the phrase "no witnesses," the court held Doody could introduce evidence Garcia personally used the phrase after the temple murders, but not in the context of the details of the tenth murder. The court noted that this court addressed this final limitation on direct appeal in 1996 and found no reversible error.

¶8            Pursuant to the court's ruling, the jury heard evidence Garcia and his girlfriend committed the tenth murder nine weeks after the temple murders and that they both pled guilty and received prison sentences, including a life sentence for Garcia. The jury learned the murder also involved armed robbery. The jury learned the names of the victim and Garcia's girlfriend, Garcia's and his girlfriend's ages and the date and location of the murder. The jury also heard evidence that Garcia pled guilty to the tenth murder as part of the plea agreement in the temple murders and that he did so to avoid the death penalty in both the temple and tenth murders. Finally, the jury heard Garcia agree that he had benefited "greatly" from his plea bargains with the state. Despite the trial court's ruling, Doody never asked Garcia if he used the phrase "no witnesses" after the temple murders. Even so, the jury heard Garcia use the phrase during his testimony about the temple murders without attributing it to Doody and, therefore, knew the phrase and its use were not unique to Doody.

### B.    Discussion

**¶9**    On appeal, Doody continues to argue the details of the tenth murder were admissible pursuant to Rule 404(b) as evidence of the common scheme or plan allegedly evidenced in the facts of the temple and tenth murders.  Doody argues the common scheme or plan was for Garcia to plan to kill people to steal their money, manipulate someone else into doing the killing and then, if caught, make a favorable deal with the state, minimize his involvement and deflect the blame for any murder to the other person.[2]

**¶10**    The trial court did not abuse its discretion when it limited the evidence of the details of the tenth murder.  First, combined with all of the evidence regarding Garcia's involvement in the temple murders and the details of the resulting plea agreement, the jury heard more than sufficient evidence about the tenth murder and Garcia's subsequent "deal" with the state to support Doody's position that Garcia was simply a ten-time murderer trying to keep his plea agreements intact by saying what the state wanted to hear and blaming Doody.  It was well within the trial court's discretion to find that additional details such as how Garcia manipulated his girlfriend into shooting the victim and why they did so were of no additional probative value.  Second, a trial court "has considerable discretion in determining whether the probative value of the evidence is substantially outweighed by its unfairly prejudicial effect." *State v. Gilfillan*, 196 Ariz. 396, 405, ¶ 29, 998 P.2d 1069, 1078 (App. 2000).  The court did not abuse its discretion when it held the probative value, if any, of the details of an unrelated murder that occurred more than two months later was outweighed by the considerations identified in Arizona Rule of Evidence 403.

**¶11**    Third, to admit another act as evidence of a common scheme or plan pursuant to Rule 404(b), the other act must be "part of 'a particular plan of which the charged crime is a part.'" *State v. Ives*, 187 Ariz. 102, 106, 927 P.2d 762, 766 (1996) (quoting *State v. Ramirez Enriquez*, 153 Ariz. 431, 433, 737 P.2d 407, 409 (App. 1987)).  It is not enough that other acts "'show similarities where one would expect differences' or demonstrate a 'visual connection' to the other charged offenses." *Ives*, 187 Ariz. at 108, 927 P.2d at 768.  Nor is mere similarity sufficient to prove conduct was part of a common scheme or plan. *State v. Hughes*, 189 Ariz. 62, 69, 938 P.2d 457, 464

---

2    Doody's defense at trial was that he was not at the temple the day of the murders, was in no way involved in the murders and he was simply a "dupe" for Garcia.

(1997). "The common scheme or plan exception requires something more than mere criminal tendencies." *Id*. The evidence must be of a "commitment to a particular plan of which the charged crime is a part. It is a matter of the particularity of the plan and thus of the probative force of the connection between one crime and another." *Ramirez Enriquez*, 153 Ariz. at 433, 737 P.2d at 409. "The distinction is between proving a specific plan embracing the charged crime and proving a general commitment to criminality which might well have involved the charged crime." *Id*. (quoting Morris K. Udall & Joseph M. Livermore, Arizona Practice: Law of Evidence § 84, 184 n.17 (2d ed. 1982)).

¶12 Here, there is no common scheme or plan and there was otherwise no probative connection between the details of the temple murders and the tenth murder. While the tenth murder further established that Garcia had criminal tendencies and/or a general commitment to criminality that might involve murder and/or robbery, the tenth murder was not evidence of a "commitment to a particular plan of which the [temple murders and/or the tenth murder were] a part." It was not enough that both events involved robberies in which Garcia and/or his accomplice shot a victim and took the victim's money. The temple murders were a mass murder. Garcia and Doody planned the temple crimes over a period of months. They gathered information regarding the layout of the temple, possible security systems, whether doors would be locked, the presence and location of gold, money and other valuables they believed might be inside as well as who would be present. They drew a diagram of the temple. They obtained weapons. They wore clothing and equipment that concealed their identities and made them appear to be law enforcement officers. They planned who would go in first and continued the law enforcement ruse to control the occupants once inside the temple. The tenth murder was a crime of opportunity committed on the spur of the moment by two teenage runaways who blundered into an unfortunate victim's campsite.

¶13 There was also no common scheme or plan because Garcia never minimized his involvement in the tenth murder and did not unjustifiably deflect blame to his girlfriend. He did not need to because his girlfriend admitted she shot and killed the victim and Garcia's statements regarding the tenth murder matched the results of the investigation of that murder "to a T." Finally, Garcia's post-arrest actions to obtain a plea deal and/or make any deal more beneficial are in no way part of a "common scheme or plan" as contemplated by Rule 404(b). Such actions do not demonstrate "commitment to a particular plan of which the charged crime is a part." Were we to hold otherwise, a defendant's attempts to minimize

involvement and/or deflect blame during a criminal investigation or plea negotiations could be considered part of a common scheme or plan. Rule 404(b) and the case law that addresses the rule do not contemplate such absurd results.

¶14        Finally, in regard to the limitation of evidence regarding Garcia's use of the phrase "no witnesses" after the temple murders, this court addressed this same issue in Garcia's first appeal in 1996 and found that limitation was well within the trial court's discretion. *State v. Doody*, 187 Ariz. 363, 375, 930 P.2d 440, 452 (App. 1996). It remains so.[3]

## II.    Sentencing

¶15        Doody committed the offenses when he was seventeen years old. The trial court found Doody's age was a mitigating circumstance for sentencing purposes. The court found the presence of an accomplice was the sole aggravating circumstance. Before it imposed sentence, the court stated:

> This crime involved the murder of nine people, the murder of nine people that would seem to be the farthest away from any one of us in terms of becoming murder victims. These people were peace loving. These people did not seek violence. They were not involved with any violence, and just the fact that these nine people were murdered is difficult enough to understand, but the people who committed these crimes, this offense, in some ways is even harder to understand.

In regard to the aggregate length of the sentences, the court further stated:

> I don't take lightly a sentence that does not allow someone to be released from prison. I obviously understand the impact of that sentence, but from my perspective, there can be no other sentence in this case other than a sentence that does not allow you to be released from prison.

The court then imposed the sentences identified above.

---

[3]        This court also addressed the exclusion of the other details of the tenth murder in the first trial and found no error. That resolution is not dispositive, however, because we addressed a different theory of admissibility than the theory Doody relied upon in the third trial. *Doody*, 187 Ariz. at 374, 930 P.2d at 451.

¶16        Doody contends his aggregate sentences, particularly the aggregate life sentences, constitute cruel and unusual punishment. He argues the United States Supreme Court opinions in *Miller v. Alabama* and *Graham v. Florida* mandate that juvenile offenders must receive sentences that grant a meaningful opportunity to obtain release from prison. Doody further argues *Miller* identified mitigating circumstances that a trial court must consider before it imposes sentence on a juvenile defendant and the trial court erred when it failed to consider and/or find those mitigating circumstances.

¶17        Doody raised no objection to his sentences or the court's failure to consider any mitigating circumstances, nor did he identify *Miller* as authority that required the court to consider any specific circumstances. Even so, "[i]mposition of an illegal sentence constitutes fundamental error." *State v. Thues*, 203 Ariz. 339, 340, ¶ 4, 54 P.3d 368, 369 (App. 2002).

¶18        We find no error. First, Doody misconstrues the holdings in *Miller* and *Graham*. In *Graham*, the sole issue was whether the Constitution permits a court to sentence a juvenile defendant to life imprisonment without the possibility of parole "for a *nonhomicide* crime." *Graham v. Florida*, 560 U.S. 48, 52-53 (2010) (emphasis added). The Supreme Court held the Eighth Amendment forbids such sentences. *Id*. at 74. The Court further held states must give a juvenile offender convicted of a nonhomicide crime "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id*. at 75. The court made clear, however, that states need not guarantee eventual freedom for a "juvenile nonhomicide offender" and are not required to release such offenders during their natural lives. *Id*. For these reasons, *Graham* has no application here.

¶19        Likewise, *Miller* has no application. In *Miller*, the Supreme Court held the Eighth Amendment prohibits *mandatory* sentences of life imprisonment without the possibility of parole for juvenile offenders. *Miller v. Alabama*, __ U.S. __, 132 S. Ct. 2455, 2460 (2012). Doody did not receive a mandatory sentence of life without the possibility of parole. Further, *Miller* expressly held that a juvenile offender who commits a homicide may still receive a sentence of life imprisonment without the possibility of parole. *Id*., __ U.S. at __, 132 S. Ct. at 2469. *Miller* simply requires the sentencing court to consider the offender's age and "how children are different" before it does so. *Id*. Despite Doody's argument to the contrary, *Miller* did not list specific mitigating circumstances the court must consider. The factors Doody identifies from *Miller* were simply the court's examples of the "hallmark features" of young age and other factors

attendant to juveniles and juvenile life that *mandatory* life sentences without the possibility of parole do not allow a sentencing court to consider. *Id.*, __ U.S. at __, 132 S. Ct. at 2468.

**¶20** Second, as noted above, the trial court found Doody's age was a mitigating circumstance. The court further noted that it considered Doody's sentencing memorandum and did not suggest that it refused to consider any of the circumstances Doody identified. That memorandum detailed Doody's background, including his difficulty in school, difficulty with the English language, the alcoholism of his stepfather, physical and mental abuse by his stepfather, Doody's social awkwardness, his lack of emotional maturity and awareness at the time of the offenses and his exemplary behavior while in custody. A trial court must only *consider* mitigating factors. *See State v. Jenkins*, 193 Ariz. 115, 121, ¶ 25, 970 P.2d 947, 953 (App. 1998). The court need not find mitigating factors simply because there is evidence of those factors. *Id.* The trial court considered the factors presented and nothing more was required.

**¶21** Finally, Doody received the minimum sentence available for each count of first degree murder - life with a possibility of release after twenty-five years. A.R.S. § 13-703(A) (1989). That Doody will spend the rest of his life in prison because the court properly imposed consecutive sentences is of no matter. A sentence that does not violate the prohibitions against cruel and unusual punishment does not become unconstitutional "merely because it is consecutive to another sentence for a separate offense or because the consecutive sentences are lengthy in aggregate." *State v. Berger*, 212 Ariz. 473, 479, ¶ 28, 134 P.3d 378, 384 (2006).

## III.　Conclusion

**¶22**　　　　Because we find no error, we affirm Doody's convictions and sentences.



Ruth A. Willingham · Clerk of the Court
FILED: ama